## THE "COLORADO."

1. At night, during a dense fog, a collision occurred on Lake Huron between a bark of 420 tons, bound down, and a propeller of 1,500 tons, bound up, the lake. The wind was from the south. The bark, well manned and equipped, having competent lookouts, properly stationed and vigilant in the performance of their duty, and with her foresail and light sails furled, was, at a speed not exceeding four miles an hour, sailing by the wind, close-hauled on her starboard tack, heading south-east by east, displaying the proper lights, and, as required by law and the custom of the lakes, giving frequent signals of two blasts from her fog-horn, which could be heard at the distance of half a mile; which signify in that locality that she was on her starboard tack, close-hauled. She held this course, until, a collision becoming inevitable, her helm was put to starboard. The propeller, with but one lookout and an insufficient watch on deck, was heading north-north-west, and moving at the rate of five or six miles per hour. The officer in charge of the propeller heard but one blast of the bark's fog-horn when the vessels were near each other, and ported her helm; but then, hearing two blasts of a second signal, ordered her helm hard a-starboard. Before this order had much effect, she struck the bark, at an angle of about forty-five degrees, on her starboard side, nearly opposite the mainmast, thereby causing the total loss of that vessel and her cargo. *Held,* that the propeller was responsible for the disaster.

2. Where, in a collision between a propeller and a sailing vessel, the proofs show that the latter kept her course, the presumption of fault on the part of the propeller, arising in the absence of evidence tending to bring the case within

any of the exceptions in the nineteenth article of the sailing rules, can only be overcome by showing that she took every reasonable precaution to meet any emergency which might arise, and that she was not guilty of the want of ordinary care, caution, or maritime skill.

APPEAL from the Circuit Court of the United States for the Eastern District of Michigan.

*Mr. George B. Hibbard* for the appellant.

*Mr. J. G. Abbott* and *Mr. Ashley Pond* for the appellee.

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Lights and other signals are required by law, and sailing rules are prescribed, to prevent collisions and to save life and property at sea; and all experience shows that the observance of such regulations and requirements is never more necessary than in a dense fog, whether in the harbor or in the open ocean, if the vessel is in the common pathway of commerce.

Mariners dread a fog much more than high winds or rough seas. Nautical skill, if the ship is seaworthy, will usually enable the navigator to overcome the dangers of the wind and waves; but the darkness of the night, if the fog is dense, brings with it extreme danger, which the navigator knows may defy every precaution within the power of the highest nautical skill.

Signal-lights in such an emergency are valuable; but they may not be seen. Bells and fog-horns, if constantly rung or blown, may be more effectual; but they may not be heard. Slow speed is indispensable; but it will not entirely remove the danger; nor will all these precautions, in every case, have that effect. Perfect security, under such circumstances, is impossible.

Danger attends the vessel if she ceases to move, as other vessels astern may come up; and, even if she goes about and takes the back track, she is still in danger from the vessels astern which have not changed their course. Such a change of course is not required by the sailing rules or by the usages of navigation. Instead of that, the best precautions are bright signal-lights, very slow speed, just sufficient to subject the vessel to the command of her helm, competent lookouts properly stationed and vigilant in the performance of their duties, constant ringing of the bell or blowing of the fog-horn, as the case may

be, and sufficient force at the wheel to effect, if necessary, a prompt change in the course of the vessel. Where all these precautions are faithfully observed, such disasters rarely occur, and the courts hear very little about inevitable accidents.

Injuries were received by the bark, as her owner alleges, on the 11th of May, 1869, in a collision which took place on Lake Huron between the bark and the propeller "Colorado," off Saginaw Bay, about half-past eleven o'clock at night, whereby the bark was sunk in the lake, and with her cargo, consisting of 45,000 bricks and 35,000 bushels of oats, became a total loss. Compensation is claimed in the libel for the value of the vessel, freight, and cargo.

By the record, it appears that the bark — a sail vessel of 425 tons — was bound down the lake on a voyage from Milwaukee to Buffalo; and that the propeller, — a large steamer of 1,500 tons, — with a small cargo of general merchandise, was bound up the lake on a voyage from Buffalo to Chicago.

Service was made, and the owners of the propeller appeared and filed an answer. Testimony was taken; and, the parties having been fully heard, the District Court entered an interlocutory decree in favor of the libellant, and referred the cause to a master to ascertain the amount of the damages. Hearing was had before the master, and he made a report. Exceptions were taken to the report by the respondent, some of which were sustained, and others were overruled; and the District Court entered a final decree in favor of the libellant for the sum of $33,675.26, with interest and costs, as set forth in the decree. Immediate appeal was taken by the respondents to the Circuit Court, where the decree of the District Court was in all things affirmed; and the respondents appealed to this court.

Errors of fact are assigned by the owners of the propeller, all of which deny that the propeller was in fault; which is the principal question in the case. Fault is also imputed to the bark; but the evidence to support the accusation is so slight, that it will not demand any extended examination. Sufficient appears to show that the night was dark, and that the fog was quite dense at the time of the collision; that the wind at that time was south; that the bark was sailing by the wind, close-hauled, on her starboard tack, heading south-east by east; that

she had pursued that course for some time, and continued to
pursue it without changing her helm, until the collision was
inevitable, when her helm was put to starboard; that she was
stanch and strong, and well manned and equipped; that she
showed the requisite signal-lights ; that she had competent
lookouts properly stationed on the vessel, and that they were
vigilant in the performance of their duty; that she blew her
fog-horn as required by law and the custom on the lakes, and
that her speed was moderate.   Two blasts were given by her
fog-horn; which signify in that locality that the approaching
vessel is on the starboard tack, close-hauled.   Signals of two
blasts were given in order that approaching vessels might be
able to determine her course, and that she was on the star-
board tack.

Prior to ten o'clock, the bark was making good speed; but,
when the fog became dense, the bark commenced to shorten
sail; and the evidence shows that all her light sails were taken
in half an hour before the collision.   Her speed before the light
sails were furled did not exceed five or six knots an hour, and
subsequently did not exceed four miles, as appears by the
weight of the evidence.

Steamers must keep out of the way of sailing ships when the
two are proceeding in such directions as to involve risk of col-
lision ; and in such a case the rule is that the sailing ship shall
keep her course, so that the steamer may not be baffled or mis-
led in the performance of the duty required of her to keep out
of the way.   Special circumstances may exist in certain cases
rendering a departure from that rule necessary in order to avoid
immediate imminent danger; but there is no evidence in this
case making it necessary to consider any of the qualifications
to the general rule.   *The Warrior*, Law Rep., 3 Ad. & Ecc.
555.

Beyond all doubt, the evidence establishes the proposition
that the bark did keep her course, as required by the eigh-
teenth article of the sailing rules; and, it appearing that there
is no evidence tending to bring the case within any of the
qualifications contained in the nineteenth article of the same
rules, the *prima facie* presumption is that the propeller was
in fault.

Three answers are given to that theory by the owner of the propeller, either of which, if true, is conclusive that the decree below is erroneous : (1.) That the bark was in fault. (2.) That the propeller was not in fault. (3.) That the collision was the result of inevitable accident.

1. Much discussion of the first proposition is unnecessary, as it has already been shown that the signal-lights of the bark were well displayed; that she had competent lookouts properly stationed, and that they were vigilant in the performance of their duty. Due signals from her fog-horn were given as frequently as required by law or the custom of the lakes, and her speed was moderate; her foresail and all her light sails having been furled or taken down at least a half-hour before the disaster.

What more the bark ought to have done the owner of the propeller does not state. Doubtless he knows that a sailing vessel cannot absolutely stop without coming to anchor; and there is no regulation or usage which requires a sailing vessel "to lie to" or go about in stays, under such circumstances; nor would it add any thing to the safety of life or property at sea if such a precaution was adopted, as the vessel would still be in the pathway of commerce, and be exposed to collision by vessels approaching from any and every direction. All her light sails had been taken in, as matter of precaution, to lessen her speed, and to put the vessel more completely at the command of her helm. Both the master and second mate were on deck; and the wheelsman was an able seaman of experience, and the lookout was stationed on the top-gallant forecastle.

When the wind is high, it is frequently necessary to reef some or all of the other sails; but it is not usual to do so *in the open sea*, when the wind is moderate, or properly described as merely a fresh breeze. Emergencies frequently arise, in rough weather, when good seamanship requires that the sails, part or all, should be furled; and it appears that part of the sails of the bark were furled. Besides, it was the propeller that struck the bark on her starboard side, nearly opposite the mainmast; and the evidence shows that the propeller cut nearly or quite ten feet into the side of the bark, having struck the bark at an angle of about forty-five degrees.

Viewed in the light of all the circumstances, the court is of the opinion that the proposition of the owner of the propeller, that the bark was in fault, is not sustained.

2. Suppose that is so: still it is insisted by the owner of the propeller that his vessel was not in fault; which is a proposition that will deserve more consideration. Attempt is made in argument to establish the proposition that the bark ought to have changed her course, and kept out of the way of the propeller; but it is a sufficient answer to that suggestion, that the evidence does not disclose any special circumstances which would have justified the bark in departing from the rule, that, when the steamer is required to keep out of the way, the sailing ship shall keep her course. Due regard, it is true, must be had in such a case to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a departure from the rule necessary in order to avoid immediate danger. Concede that, but still it is equally well settled, that where no special circumstances are proved, showing that a departure from the rule was necessary to avoid immediate danger, the obligation on the part of the sailing vessel is imperative to keep her course.. *The Sunnyside, supra*, 205; *Crocket* v. *Newton*, 18 How. 583; 1 Pars. Ship. & Ad. 580.

Still it is insisted by the respondent that the propeller was not in fault; and, in order to determine that question satisfactorily, it will be necessary to refer again to the evidence. Nor can the details of the evidence be entirely avoided, as there is some conflict in the testimony of the witnesses.

All agree that the night, subsequent to eleven o'clock, was foggy, and that the wind was south, blowing only a moderate breeze; and the evidence shows that the mate of the propeller had charge of her navigation. His watch consisted of the wheelsman, one lookout (stationed forward on the promenade-deck), and one engineer, who had charge of the engine; that the propeller was one of the largest on the lake, measuring fourteen hundred and seventy tons; that she was heading north-north-west at the time the fog settled down, and that her speed was between nine and ten miles an hour. It appears from the testimony of the mate that the fog became very dense, and that he spoke to the master, who was in his room, lying on a

lounge, and that, pursuant to the master's suggestions, he directed the engineer to let the propeller go slow; and he testifies that he took his position in front of the pilot-house, where he continued to sound the whistle, every one or two minutes, up to within a very short time of the collision. He is confirmed by the master as to the directions given to the engineer; and the master admits that he immediately returned to the lounge, where he fell asleep, and that it was the jar of the collision that aroused him from the lounge.

Enough appears to show conclusively that there was but one lookout, and no other seamen to assist the wheelsman in any emergency which might arise; though the master, as well as the mate, was fully apprised that the fog was unusually dense, and both knew full well that the course of the propeller was in the much-frequented pathway of commerce. Such a watch, consisting only of the mate, one wheelsman, and one lookout besides the engineer, could hardly be deemed sufficient for such a large propeller, even in a clear night; and if not, it certainly cannot be regarded as one equal to the emergencies likely to arise in a dark night, when the fog was as dense as it was on the night of the collision.

Ocean-steamers, as remarked by this court on a former occasion, usually have, in addition to the officer of the deck, two lookouts, who are generally stationed, one on the port and one on the starboard side of the vessel, as far forward as possible. During the time they are charged with that service, they have no other duties to perform; and no reason is perceived why any less precaution should be taken by first-class steamers on the lakes. Their speed is quite as great, and the navigation is no less exposed to the dangers arising from the prevalence of mist and fog, or from the ordinary darkness of the night; and the owners of vessels navigating there are under the same obligations to provide for the safety and security of life and property as attaches to those who are engaged in navigating the sea. *Chamberlain* v. *Ward*, 21 How. 571.

Required, as steamers are, to keep out of the way of sailing vessels, the propeller is at least bound to show that she took reasonable precaution to meet any emergency which might arise from the darkness of the night, and that she was not

guilty of the want of any ordinary care, caution, or of maritime skill. Those in charge of her navigation knew that she was in waters frequented by other vessels, and that many other vessels were in the vicinity at that time, as indicated by the fog-horns heard from almost every direction.

Signal-lights were obscured by the density of the fog; but the sound of the fog-horns could be heard, and the evidence shows that the number blown ought to have admonished the master before he went to sleep, as well as the mate, that the surrounding and approaching dangers might make it necessary to effect sudden changes in the course of the propeller.

Sudden dangers of collision might reasonably have been expected from the extreme darkness of the night and the known vicinity of other vessels. Under such circumstances, it is apparent that the watch on deck, considering the size of the propeller and her speed, was not sufficient for the occasion. Support to that view, if more is needed, is found in the fact, that when the emergency came the mate deemed it necessary, when he gave the second order to the wheelsman, to direct the lookout to leave the place where he was stationed, and go to the wheel to help the wheelsman to put the same hard a-starboard, leaving the propellor for the time being without any lookout. *The George*, 9 Jur. 670; *The Mellona*, 3 W. Rob. 13.

Lookouts are valueless unless they are properly stationed, and vigilantly employed in the performance of their duty; and if they are not, and in consequence of their neglect the approaching vessel is not seen in season to prevent a collision, the fault is properly chargeable to the vessel, and will render her liable, unless the other vessel was guilty of violating the rules of navigation. *Baker* v. *City of N. Y.*, 1 Cliff. 84; *Whitridge* v. *Dill*, 23 How. 453; *The Catharine*, 17 id. 177.

Evidence entirely satisfactory is exhibited in this case, showing that the fog-horn of the bark could be heard for half a mile; and yet it is clear, both from the testimony of the lookout and the mate, that the fog-horn of the bark was not heard until the two vessels were quite near together; and they both testify that they heard only one blast of the horn in the first instance. They agree in respect to the conversation between them when they heard that blast of the horn; and the mate

states that he was standing in front of the pilot-house, but the lookout testifies that they were forward on the promenade-deck. Probably the statement of the mate is correct: and he also states that he and the lookout heard the blast of the horn about the same time; that he immediately gave the order to the man at the wheel to port, and went to the top of the pilot-house and gave the signal to stop both engines; that he gave the order to port just as he started, and went to the top of the pilot-house as quick as he could; that he then heard two blasts of the fog-horn from the bark; and that he immediately gave the order to the wheelsman to put the wheel hard a-starboard, and ordered the lookout " to the wheel to help put it over," and gave the signal for the engines to back.

Steamers of such size, under such circumstances, ought never, in a dark night, to be without a watch on deck sufficiently effective to change the course of the vessel with celerity, without withdrawing the lookout from his station and appropriate duties; nor is it good seamanship for the officer of the deck, if without any assistant in the navigation of the vessel, to station himself in a position where he cannot in such an emergency give immediate signals to the engineer in charge. Even seconds are of great importance when the peril is impending and the danger imminent, as the lives of all on board, and property to a large amount, may be sacrificed by a moment's delay.

Owners of steamships are bound to afford such reasonable protection to life and property as may be in their power in such emergencies, and moments of extreme peril; and, in the judgment of the court, a watch consisting of one officer only and one wheelsman and one lookout, in such a night and under such circumstances, is not sufficient to afford the security to life and property which the owners of such a steamer are bound to afford. Where there is only one officer left on deck, and only one man assigned to duty as a lookout, the watch on deck, including the officer, ought always, in a dark night, to be sufficient to navigate the vessel, even in an emergency, without calling off the lookout to assist at the wheel; as such a steamer in such a night should never, in the judgment of the court, be

without at least one lookout to keep watch for approaching vessels.

Forewarned as the master was of the impending danger, he might, if he found it necessary that he should go to the lounge for repose, have increased the watch on deck, or have ordered the second mate or another seaman to the temporary assistance of the lookout, especially as the lookout had been on duty four or five hours when the mate informed the master of the density of the fog. All the master did was to direct the mate to tell the engineer to " let her go slow," and then he went to sleep. Doubtless the order was given to the engineer, and it appears that he slackened the speed of the steamer. Before that, her speed had been between nine and ten miles an hour. Considerable change undoubtedly was made under the order communicated to the engineer by the mate. The engineer testifies that her speed after that did not exceed four miles an hour; but other witnesses entitled to credit testify that the steamer still made five or six miles an hour. Judging from the effect of the blow when the propeller struck the bark on her starboard side, it is scarcely possible to believe that the estimate of the engineer is correct.

Steamships have great power, and in many instances are capable of great speed, and consequently are always required to observe a great degree of caution, particularly in a dark night. When the night is dark, they are required to be watchful, both as to their speed and course. In regard to the former, it is a question of fact, in each particular case, whether the speed was excessive or not; and, in determining that question, the locality, the hour, the state of the weather, and all the circumstances of the occasion, are to be fully considered. *The Europa*, 2 Eng. Law & Eq. 564; 1 Pars. on Ship. & Ad. 575; *Newton* v. *Stebbens*, 10 How. 606; *The Rose*, 2 W. Rob. 3; *The Steamer Charles*, 19 How. 111.

Vessels propelled by steam, if navigating in thoroughfares of commerce, are always required, whenever the darkness is such that it is impossible or difficult to see approaching vessels, to slacken their speed, or even to stop and back, according to circumstances; and this court intimated that the principle of that requirement might be applied in a qualified sense to sailing

vessels, in crowded thoroughfares, when the darkness was so intense that vessels ahead could not be seen, if it appeared that the sailing vessel was proceeding *with a strong breeze under a full press of canvas and with all her studding-sails set.* *The Morning Light*, 2 Wall. 558.

Subject to the qualifications there stated, no doubt is entertained that those suggestions are correct; but they are not applicable to the case before the court, for two reasons : (1.) Because the general rule is, that sailing vessels may proceed on their voyage *in the open sea*, although it is dark, observing all the rules of navigation, with such additional care and precaution as experienced and prudent navigators usually employ under similar circumstances. (2.) Because the bark did shorten sail, and adopt every necessary precaution. Sailing ships should never, in a dark, foggy night, hazard an *extraordinary press of sail;* and, in case *of unusual darkness*, it may be reasonable to require them, when navigating *in a narrow pathway*, where they are liable to meet other vessels, to shorten sail, if wind and weather will permit. *The Morning Light, supra.*

Requirements of the kind are intended as precautions; but the more important rule is, that steamships shall keep out of the way of sailing vessels; and the sixteenth article of the sailing rules provides, that when steamships are approaching another ship, so as to involve risk of collision, they shall slacken their speed, or, if necessary, stop and reverse; and the express provision is that every steamship shall, when in a fog, go at a moderate speed.

Great difficulty would attend any effort to define, with mathematical precision, what is a moderate speed in any particular case, further than to say that the speed ought not to be so great that the steamer cannot perform the duty imposed upon her by the act of Congress, — " to keep out of the way of the sailing vessel," if the latter has in all respects complied with the rules of navigation. Different formulas have been suggested by different judges as criterions for determining whether the speed of a steamer in any given case was or was not greater than was consistent with the duty which the steamer owed to other vessels navigating the same waters; but perhaps no one yet suggested is more useful, or better suited to enable

the inquirer to reach a correct conclusion, than the one adopted by the Privy Council. *The Batavier*, 40 Eng. L. & Eq. 25.

In that case the court say, "At whatever rate she (the steamer) was going, if going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate." Apply even a less strict rule to the case before the court, and it is clear that the propeller, in view of the insu... ʸency of the watch on deck for such a steamer in such a night, and the extreme darkness, was guilty of negligence in not slacking down her speed to a slower rate.

Beyond all question, it was her duty to have seen and heard the bark in season to have complied with the requirement to keep out of the way of the bark; and it appears that she might have done so, if those responsible for the navigation of the propeller had not been guilty of negligence. Two blasts of the fog-horn were blown by the bark; but the mate and lookout did not, in the first instance, hear but one, when the mate gave the order to port, which proved to be a wrong order. Presently both the mate and the lookout heard two blasts; and then the mate gave the order, "Hard a-starboard!" and sent the lookout to assist in carrying the order into effect; but the collision occurred before the last order had much effect.

Examined in the light of these facts, which are fully proved, it is obvious that neither of the orders was given in season to be of any substantial avail, and that the propeller is responsible for the disaster.

3. Other defences failing, it is next insisted by the owner of the propeller that the collision was the result of inevitable accident; but, having decided that the propeller was in fault, the discussion of that proposition is unnecessary, as such a defence can never be maintained, unless it appears that both parties were without fault.

Exceptions were taken in the District Court to the report of the master; and it is insisted, in behalf of the propeller, that error was committed in confirming that report. Some of the exceptions were sustained, and others overruled; and, in the judgment of the court, the report as confirmed is correct.

*Decree affirmed.*