## THE NACOOCHEE.

### MOSELEY and others *v.* THE NACOOCHEE.

*(Circuit Court, S. D. New York.  1886.)*

COLLISION—BETWEEN A STEAMER AND A SAILING VESSEL—FOG.

A steamer in the fog passed a schooner bound in the same direction.  About half an hour later those on the steamer thought they heard cries of distress, and the steamer was turned about to discover and succor those supposed to be in distress.  A competent lookout was on the steamer, which was going about seven knots an hour.  While thus proceeding, a fog-horn was heard off her starboard, and immediately the sails of the schooner appeared indistinctly through the fog on the starboard bow of the steamer, and was seen to be sailing across her bow on a converging course.  The captain of the steamer promptly reversed her engines full speed astern, and called to those on the schooner to put her helm hard a-port, but she kept on her course, and, before the steamer had fully stopped going ahead through the water, the vessels came into collision.  The schooner sunk in a few minutes; her crew escaped by the boats, and were taken on board the steamer.  Prior to the collision there were only two men on the deck of the schooner: a lookout, who was also engaged in blowing a fog-horn, and a man at the wheel.  *Held* that, although the steamer was engaged in a laudable duty in seeking to aid those supposed to be in distress, she was liable on the ground that she did not, while in a fog, go at a moderate speed, and that the schooner was in fault for sailing short-handed under the circumstances

In Admiralty.    See 22 Fed. Rep. 855.

The steam-ship Nacoochee, while on her voyage from Savannah to the city of New York, upon a course N. ½ E., off Cape May, about 1:30 P. M. of April 16, 1883, during a fog, passed the schooner Lizzie

Thompson, bound in the same direction. The schooner was on the port side of the steam-ship, and, seen through the fog, was apparently on a parallel course, and about 200 yards away, but she was in fact on a N. N. E. course, so that the steam-ship subsequently passed across the schooner's bow at a time when the two vessels were not visible to each other. About half an hour later those on board the steamer heard, or supposed they heard, cries of distress abeam to the starboard, and after consultation between the officers the steamer was turned about until she was steadied on a course of about S. S. E., and proceeded at half speed, seeking to discover and succor those supposed to be in distress. While thus proceeding a fog-horn was heard off her starboard bow, and immediately the sails of a vessel, which proved to be the Lizzie Thompson, appeared indistinctly through the fog on the starboard bow of the steamer, and was seen to be sailing across her bow on a converging course. At this time a competent lookout was on the stem of the steamer; the captain was on deck between the pilot-house and the stem, (the pilot-house being just abaft a foremast,) the second officer was on watch in the pilot-house, and the quarter-master was at the wheel, and all of them were trying to discover the object of their search. All of them heard the fog-horn of the schooner, and saw her sails appear in view, about the same time. The captain immediately ordered the engines reversed full speed astern; the order was promptly obeyed; the captain called to those on the schooner to put her helm hard a-port, but the schooner kept her course, and, before the steamer had fully stopped going ahead through the water, the vessels came into collision. The bow of the steamer struck the schooner's port quarter aft of the main chains, a few feet from the taffrail, and penetrated two or three feet into her. The schooner sank in a few minutes, and her crew escaped by the boats, and were taken on board the steamer. The Nacoochee was a right-handed propeller of about 3,000 tons burden, and about 300 feet in length. She had compound engines, reversible by steam in about 12 seconds. Her ordinary full speed was about 14 knots an hour, at 62 revolutions of her propeller per minute. When the order to reverse was given she was running at 30 revolutions. When running at half speed she would forge ahead 600 to 800 feet, after reversing her engines, before beginning to go backwards.

The schooner Lizzie Thompson was returning, bound for New York city, from a fishing cruise, with a catch of mackerel, having on board 16 men. She was of 73 tons burden. When she was overtaken and passed by the steamer she was on a course N. N. E. The wind was S. S. E., blowing at the rate of 8 to 10 miles an hour, and she was going about 4 knots an hour, with all sails set. She kept her course and speed to the time of the collision. Prior to the collision the only men on deck were two: a lookout forward, who was also engaged in blowing a fog-horn, and a young man (aged 20) at the wheel. All

the rest of the men, including the captain, were below.   The lookout discovered the steamer at about the time those on the steamer discovered the schooner.   He immediately gave the alarm; those below rushed on deck; a collision seemed to be inevitable; and all hands occupied themselves in trying to get off the boats and dory.   Each vessel sounded the proper fog signals from the time the steamer first saw the schooner, but after the steamer had passed the schooner those on either vessel did not hear the signals of the other until those on the steamer heard the fog-horn of the schooner immediately prior to the collision.   At the time just prior to the collision the schooner, when discovered by the steamer, was about 500 or 600 feet away. The lookout on the schooner did not discover the steamer quite as soon as those on the steamer discovered the schooner.

*Butler, Stillman & Hubbard* and *W. Mynderse*, for libelants.

*John E. Ward* and *William Wheeler*, for claimant and appellant.

WALLACE, J.   Although the Necoochee, in deviating from her voyage in the effort to render assistance to those she supposed were in distress, was engaged in a most laudable duty, she was not absolved from the obligation of keeping out of the way of the schooner so far as this was practicable by the exercise of all reasonable care.   She was not justified, although performing a salvage service of the highest order of merit, in unnecessarily imperiling the lives and property of others. Assuming that the schooner obeyed the rules of navigation, it devolves upon the steamer to establish the defense of inevitable accident.   *The Carroll,* 8 Wall. 302; *The Scotia,* 14 Wall. 170; *The Colorado,* 91 U. S. 692.   That defense implies that the accident was not avoidable by the exercise of all reasonable precautions adequate to the emergency; not that the collision was one which might have been obviated by using extraordinary skill and extraordinary diligence, but that it could not have been by the exercise of that degree of care and vigilance which would have been adopted by prudent navigators under the same circumstances.   Assuming, on the other hand, that the schooner was culpable because she did not have a proper lookout,—one who should have been charged with the single duty of observation, instead of the double duty which he was attempting to perform,—or that she was in fault in not porting her helm after the collision was imminent, or was in fault otherwise, so long as her fault was not the sole cause of the collision, the steamer cannot escape her share of responsibility for the loss if the situation was due in part to her own negligence.   It was the duty of the schooner to maintain her course until it became apparent that the steamer could not keep out of the way; and if, after the situation became so critical as to justify departure from the ordinary rules of navigation, the schooner committed an error, the steamer is not wholly absolved, unless she was without fault in bringing about the situation.

The libel alleges that when the steamer was first seen she was 500

or 600 feet off, coming directly and rapidly towards the schooner, and that there was room, and twice the room, sufficient for the steamer to have cleared the schooner without injuring her. This is the only allegation of fault charged in the libel. The answer alleges that soon after the course of the steamer had been changed, the schooner was seen by the captain and those navigating said steamer close to the starboard bow of said steamer; that the steamer was immediately stopped, and the engine backed full speed astern, but nevertheless the schooner was struck by the steamer. Upon this issue it is urged against the steamer that she was negligent in not discovering the schooner earlier, in proceeding at too great speed, and in not putting her bow to starboard after she reversed her engine. It is to be observed, preliminarily, that, from the time the steamer turned about after the cries of distress were heard, she was engaged in an attempt well calculated to enlist the zeal of all on board who had any duty to perform, and stimulate them to diligence. The cries could not have been audible at a great distance. The fog was of considerable density, so much so that a vessel could not be seen much if any beyond a distance of 200 yards away, and a small boat could not be seen perhaps at half that distance. The undertaking upon which the steamer had set out would probably be frustrated if a rapid speed was maintained. It was indispensable, also, that a critical observation in all directions should not be omitted. Negligence in either respect would have been little less than criminal. It is reasonable, therefore, to assume that every one of those in charge would be at his post of duty; that a vigilant lookout would be maintained; and that the steamer would be kept at only such speed as would enable her to be handled with celerity. The evidence harmonizes with the presumptions which are naturally suggested by the occasion in all respects save one. Every man was at his post; every man heard the fog-whistle of the schooner, and saw her sails appearing through the mist at substantially the same time. As soon as the situation could be comprehended, the order to reverse at full speed was promptly given, and was as promptly obeyed. But the rate of speed which was maintained is fixed by the testimony of the engineer of the steamer at about seven knots an hour or more, and no argument or inference from probabilities can displace this fact.

Notwithstanding the statement of the answer that the schooner was seen by those on board the steamer close to the steamer's starboard bow, the proofs do not convict the steamer of negligence in not discovering the schooner earlier. The vessels were probably not visible to each other much if any over 200 yards away. When they first met, each saw the other about 500 or 600 feet away, but at that distance not so distinctly that the course of the schooner could be determined by those on the steamer further than sufficient to indicate its general direction. At the time of the collision those on the steamer discovered the schooner before those on the schooner discovered the

v.28r.no.8—30

steamer. It is not probable that the schooner saw the steamer at the time of the collision a further distance off than is alleged in the libel. The lookout on the schooner evidently did not discover the steamer until after he had blown the fog-horn which was heard by those on the steamer. Immediately after he discovered her, he thought she would run the schooner down, and he gave the alarm, and those below rushed upon deck. His fog-horn was heard by every man on duty on the steamer, and doubtless stimulated all of them to observation; and the proofs are explicit that they discovered the steamer about the time or immediately after hearing the fog-horn. When the vessels were approaching on their converging courses to the point of collision they must have been nearing each other at the rate of about 800 feet per minute. Approaching with this rapidity, if those on both vessels were maintaining a vigilant observation, it is not surprising that the vessels should have got as near as from 500 to 600 feet before either saw the other, or as near as they were when they saw each other on the first occasion. Probably at the time the fog-horn was blown upon the schooner the vessels were 200 yards apart, and neither was visible to the other until they had approached from 50 to 100 feet nearer. Certainly those on the steamer discovered the schooner as soon and probably before the lookout on the schooner discovered the steamer. Believing that those on the steamer were not only vigilant in their observations, but vigilant to an unusual degree, the conclusion is that the steamer discovered the schooner as soon as she was discoverable.

Was the steamer proceeding at undue speed? She was making 30 revolutions of her engine per minute, which fixes her speed with accuracy at between 6 and 7 knots an hour. The only rule to be extracted from the authorities by which to determine whether a given rate of speed is moderate or excessive, in view of the particular circumstances of the occasion, is that such speed only is lawful as will permit the steamer seasonably and effectually to avoid a collision by slackening speed, or by stopping and reversing within the distance at which an approaching vessel can be seen. The rule laid down in *The Europa,* Jenkin's Rule of the Road, 52, is quoted in the case of *The Pennsylvania,* 19 Wall. 125, and has been frequently reiterated in language or substance in other adjudications. *The Batavier,* 40 Eng. Law & Eq. 25. *The Colorado,* 91 U. S. 703. This is that a steamer has no right on any occasion to navigate at such a rate that it is impossible for her to prevent damage, taking all precautions at the moment that she sees danger to be possible; and more specifically "if she cannot do that without going less than five knots an hour." In the case of *The Pennsylvania* the speed of the steamer was seven knots, but the fog was so dense that a large vessel could hardly be seen at the distance of 50 feet. In many reported cases, however, a rate of speed no greater than was maintained by the steamer here, and in some cases, a much less rate, has been declared

to be immoderate. *The A. Rossiter*, 1 Newb. Adm. 225; *The Robert and Ann*, Holt, Rules of the Road, 58; *The Monticello*, 1 Holmes, .7; *The Magna Charta*, 25 Law T. (N. S.) 512; *The Pottsville*, 6 Fed. Rep. 631; *The Blackstone*, 1 Low. 485.

In the case of *The Batavier*, 9 Moore, P. C. 286, the witnesses stated the rate of speed of the steamer all the way from ten knots to one and a half, and the court deemed it unnecessary to ascertain the precise speed, being of opinion that any rate of speed was too great that endangered other vessels in the river. Severe as the rule to be deduced from the authorities is towards steamers, it is apparently the only practical one. A steamer must of course maintain a speed sufficient for steerage way, and the speed sufficient for this purpose differs with different vessels. When the rate of speed is exceeded, it is not unreasonable to consider it immoderate whenever it is so great as to be inconsistent with the duty of the steamer to avoid other vessels which she ought to be able to see. Applying that test here, it must be held that the Nacoochee was in fault. Although some of her witnesses testified· that a speed of about six knots an hour was necessary in order to keep her under full control, this testimony consists merely of general statements of opinion, and no facts are given. Such testimony is not generally accepted as persuasive. At the rate at which she was going she would run at least 600 feet, and probably 700 or 800 feet, after her engines were reversed, before she would begin to move backwards. Her engineer was unwilling to testify that she could be stopped before running a thousand feet, and her captain fixes the distance at from 600 to 800. It is not credible that she would not have been under control if she had been going at half the speed she actually was, and in that case she could have been stopped within a much shorter distance. Assuming that the vessels were 500 feet apart when the order to stop and reverse was given; that the order was given (as the proofs show) as promptly as possible upon discovery of the schooner; and assuming, as the proofs also show, that the schooner was discovered by the steamer as far away as she was discoverable in the state of the fog,—the conclusion is irresistible that she was going at a rate of speed which precluded her from properly performing her duty towards the schooner.

The only fault suggested against the steamer as occurring after she saw the schooner is that she did not, in addition to reversing at full speed, starboard her helm, and thereby throw her bow to starboard. The propeller being right-handed, the effect of starboarding, if any, during the interval in which the steamer was stopping, would have been to turn her to starboard after she had attained her backward motion; but it is well known that when the ship is stopping by the reversal of her screw the influence of the rudder is comparatively feeble and uncertain. The testimony of the experts is to the effect that, if the helm had been put hard to starboard while the steamer was backing full speed astern, no influence would have been exercised

upon her bow. She had not got upon her backward motion when she struck the schooner. Testimony has been offered in this court to show that an order to hard starboard the helm was given by the captain. No witness but the captain was called to prove this fact, and he did not mention it in his testimony in the court below. The answer does not assert that such an order was given. If it was one which should have been given, a conclusion would be reached adverse to the steamer upon the ground that it was not given. But believing that everything was done which would have been effective to avoid collision after the steamer discovered the schooner, the steamer is not to be held responsible for not starboarding her helm. The liability of the steamer is placed upon the ground that she did not, while in a fog, go at a moderate speed.

The court below held the schooner in fault for sailing short-handed, under the circumstances. With only two men on deck, one was at the helm and the other was acting as a lookout and blowing the fog-horn. Additional evidence has been introduced in this court by the libelants, consisting of the testimony of experts to disprove the theory that an additional lookout would have been of service, or that anything could have been done which was not done had an additional man been on deck to give orders to the man at the helm. The new testimony is of very little value. The observations in the opinion of the learned district judge in respect to the culpability of the schooner are fully approved, and it is not deemed necessary to recapitulate or enlarge upon them.

The usual argument is urged that the faults on the part of the schooner in no way contributed to the collision. But it cannot well be maintained that if the schooner had been discovered earlier, her course more accurately determined, and orders had been given promptly to the man at the helm to port, or even if these orders had been given and obeyed when the captain of the steamer called out to the schooner to port, that the collision might not have been avoided. The case is a hard one for both parties. It is a hard one for the owners of the steamer, because their loss is the outcome of an effort of those in command to extend assistance to fellow-beings who might be in distress; and the circumstances give some slight color to the conjecture that the supposed cries of distress were demonstrations of another kind from some of the men of the schooner. The testimony has been carefully considered, with an inclination to give the steamer the benefit of all fair doubts, but it has seemed impossible to resist the conclusion that she was going in a fog at a speed not only inconsistent with her ability to keep out of the way of other vessels at a distance at which they could be seen, but also at a speed which was unnecessarily and imprudently great for the special service in which she was engaged.

The decree of the court below is affirmed, but, as both parties have appealed, without costs of this court.