OLIVER J. OLSON & CO., a corporation, Libelant,

v.

THE American Steamship MARINE LEOPARD, etc., and Luckenbach Steamship Company, Inc., a corporation, Respondents.

LUCKENBACH STEAMSHIP COMPANY, Inc., a corporation, Libelant,

v.

OLIVER J. OLSON & CO., a corporation, et al., Respondents.

Matter of the Petition of OLIVER J. OLSON & CO., a corporation, for exoneration from, or limitation of, liability as owner and operator of THE Steamship HOWARD OLSON.

Nos. 27332, 27376, 27412.

United States District Court
N. D. California, S. D.

June 4, 1957.

As Corrected June 27, 1957.

Gregory A. Harrison, J. Stewart Harrison, Brobeck, Phleger & Harrison, San Francisco, Cal., for Oliver J. Olson & Co.

Norman B. Richards, McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, Cal., George H. Hauerken, Hauerken, St. Clair & Viadro, San Francisco, Cal., for Marine Leopard Cargo.

Joseph J. Geary, Allan E. Charles, Willard G. Gilson, Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for Luckenbach S.S. Co., Inc.

HAMLIN, District Judge.

Approximately 2:19 A.M. on May 14, 1956, the freighter Marine Leopard collided with the lumber schooner Howard Olson in the Pacific Ocean, about three miles off the California Coast near Point Sur. A few minutes after the collision the Howard Olson sunk. The collision gave rise to a number of admiralty ac-

tions and three were consolidated for trial at this time for the purpose of determining fault. The consolidated actions consist of a libel filed by Oliver J. Olson & Co., the owners of the Howard Olson, against the Marine Leopard and her owners, Luckenbach Steamship Company, for damages occasioned by the total loss of the Howard Olson; Luckenbach's cross libel against Olson & Co. for damages to the Marine Leopard; and, finally, a petition of Olson & Co. for exoneration from liability or, in the alternative if liability be found, that it be limited to the value of Olson & Co's. interest in The Howard Olson after the collision (46 U.S.C.A. §§ 183–189). Numerous personal injury and death claimants and cargo claimants filed claims in the limitation action, but only a few took active part in the present trial.

The Marine Leopard is a C–4 freighter, 622 feet 10 inches long with a beam of 71 feet 7 inches and 10,662.53 tons gross register. The Howard Olson was a 261-foot vessel of 2,477 gross tons, especially equipped for the lumber schooner trade. The Olson had left San Pedro, California, in ballast during the afternoon of May 12, 1956, northbound for Coos Bay, Oregon. The Marine Leopard had departed San Francisco the next morning, May 13, and was bound down the coast to San Pedro.

Testimony most favorable to Olson & Co. shows that during the early hours of May 14 the Howard Olson was proceeding northward on a course of 320° true, three to five miles off the coast at a speed of approximately eight knots. The weather was clear and visibility was later estimated to be about 20 miles. Zinkiewicz, the Olson's second mate, had taken the watch at midnight. He had signed aboard the Olson for the first time on May 12, 1956, and this was only his third watch. About 1:30 A.M. the lookout, who was stationed on the wing of the bridge, reported a light on the starboard bow and it later turned out that this light originated from the southbound freighter, John B. Waterman. Approxi-

mately ten minutes later the lookout sighted another light which turned out to be from the southbound Marine Leopard, and reported it to the mate as being one point on the starboard bow.

The mate, Zinkiewicz, testified that the Marine Leopard was approximately 12 miles away when her white light was first called to his attention. When the distance between the vessels had narrowed to an estimated five to six miles at approximately 2:10 A.M. the mate testified that he saw the green running light of the Leopard and determined that the positions and courses of his vessel and the Marine Leopard called for a starboard-to-starboard passing. He testified that the Olson continued its 320° course until 2:15 A.M., when it made a 10° change to the left. Witnesses aboard the Olson testified that a two-blast whistle was sounded by the Olson to indicate this change of course. Olson witnesses stated that during this entire period the lights of the Leopard remained on the Olson's starboard bow, from one to four points. It was the contention of Olson & Co. that soon after the helmsman had steadied the ship on her new course of 310°, the range lights of the Marine Leopard closed and her green running light shut out and her red light began to show. To someone in the position of the Olson this naturally indicated a right turn or swing on the part of the Marine Leopard.

Zinkiewicz testified that on seeing the Leopard swing across his bow, he signaled full astern on the engine room telegraph and at about the same time ordered the helmsman to "keep coming left". Neither of these actions was accompanied by whistle signals. The second mate's last minute efforts were unavailing and the collision occurred within a minute after the last order. The stem of the Leopard struck the Olson on the starboard side at an eighty to ninety degree angle about amidship and cut almost completely through her before coming to a stop and backing off. The crew members of the Olson were forced to abandon ship in such haste that they were unable

to launch a lifeboat. Four of the Olson's crew lost their lives.

Luckenbach's concept of the collision differs materially from the one put forth by Olson & Co. Testimony most favorable to Luckenbach shows that at midnight, prior to the collision, the third mate, Doyle, assumed the watch. Except for a minor variation of short duration, the Marine Leopard maintained a course of 156° true, and a speed of approximately 17 knots from the time Doyle took over until a few minutes after 2:00 A.M. About 1:30 A.M. the Leopard's lookout sighted a white light and reported it to the bridge as being a white light dead ahead. The white light eventually was identified as coming from the Howard Olson. The report was received by Doyle.

The Leopard had been following the Waterman on substantially the same course since leaving San Francisco the previous day and, because the Waterman was travelling at a slightly slower speed than the Leopard, the latter was gradually overtaking her. The Waterman was almost broad on the Leopard's port beam and about .3 to .4 miles off when the Olson's lights were reported.

Captain Snow of the Leopard had left written instructions to be called fifteen minutes prior to coming abeam of any light along the coast. A few minutes before 2:00 A.M. Doyle sent word to the Captain that the vessel would be abeam of Point Sur in fifteen minutes. The Captain arrived on the bridge at approximately 2:00 A.M. and Doyle reported to him the position of the Waterman and of the Olson, and the speed of the Leopard. The mate testified that when the Captain came on the bridge at 2:00 A.M. the Howard Olson was one point on the port bow. The Captain observed the lights of the Howard Olson and he testified that he found them to be "very near ahead". The Captain then determined that if the Leopard continued on her course of 156° she would pass farther off Point Sur than he originally intended and, therefore, ordered the course to be changed to

the left to 150°. This occurred at 2:02 A.M.

The Leopard continued on a course of 150° until 2:10 A.M., when the Captain saw the red and green lights as well as the range lights of the Olson about four miles distant. The Captain then changed course to the right to 152° in order to give the Olson more room for the port-to-port passing which he contemplated. The 152° course was maintained until the gap between the two vessels narrowed to a little less than three miles, at which time the Leopard gave way more to the right and pursued a heading of 154°. Then, when the vessels were approximately two miles apart, the Captain ordered 2° more to the right, to 156° true, but before the helmsman could steady on that course the Captain ordered him to "keep coming right", which caused the Leopard to drift to the right. The Leopard continued on this rightward drift for about half a minute, and then at 2:16½ the Captain ordered a "hard right". The Leopard witnesses testified that she maintained this hard right course for a minute and a half, until 2:18, when the ships collided. The Captain testified that the hard right maneuver was necessitated by the fact that the Howard Olson had suddenly cut across the Leopard's bow.

The Marine Leopard did not signify any of her course changes with whistle blasts. The Captain testified that it was not customary to blow whistles at sea every time a minor course change was made.

It is the contention of each of the owners of the vessels involved that the collision was caused by the sole fault of the other. On the other hand, the proctors for the cargo claimants, who actively participated in the trial, contend that there is mutual fault. I will first consider the charges made against the Howard Olson.

One of the main areas of controversy during the trial was whether the vessels were meeting end on, or nearly end on, prior to the collision. If so, Article 18

of the International Rules for Navigation at Sea, as set forth in 33 U.S.C.A. § 146b(a), known as the head-and-head rule, was applicable. Article 18 provides:

"(a) When two power-driven vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other. This section only applies to cases where vessels are meeting end on, or nearly end on, in such a manner as to involve risk of collision, and does not apply to two vessels which must, if both keep on their respective courses, pass clear of each other. The only cases to which it does apply are when each of two vessels is end on, or nearly end on, to the other; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own; and by night, to cases in which each vessel is in such a position as to see both the sidelights of the other. It does not apply, by day, to cases in which a vessel sees another ahead crossing her own course; or, by night, to cases where the red light of one vessel is opposed to the red light of the other or where the green light of one vessel is opposed to the green light of the other or where a red light without a green light or a green light without a red light is seen ahead, or where both green and red lights are seen anywhere but ahead."

Any discussion of the applicability of Article 18 in the instant case necessarily concerns the navigational lights of each vessel. There was no substantial evidence that each vessel did not have required lights properly positioned and brightly burning and I therefore find that such was a fact.

Since the meeting took place at night each vessel must have been "in such position as to see both sidelights of the other" ahead in order for the rule to be applicable.

Captain Snow of the Marine Leopard testified that at 2:10 when the vessels were approximately 3.3 miles apart, he saw both sidelights of the Howard Olson about 3° off the port bow. Within the next four to six minutes he executed a series of three course changes to the right and during this period only the red sidelight of the Olson was seen, either dead ahead or slightly on the port bow. Doyle, who was on the bridge with the Captain at this time, gave substantially the same testimony.

Article 18 requires that both sidelights must be seen ahead in order for the vessels to be considered meeting end on or nearly end on. However, I believe that a variance of 3° from dead ahead is not sufficient in this instance to say that Captain Snow was in error in concluding at 2:10 that Article 18 was applicable. Therefore I am satisfied that the requirements of Article 18 were fulfilled so far as the Marine Leopard was concerned. The subsequent observation of a red light is a natural result of the adoption of a port-to-port passing as prescribed by the rule.

But the Article requires that each vessel must see both sidelights of the other ahead. If the testimony of the majority of the crew members of the Olson who observed the lights of the Leopard was accepted, I would have to hold that Article 18 did not apply, since, in substance, they testified that they saw only the green light of the Leopard from the time the sidelight was first sighted until a few minutes before the collision, and that light was not ahead but was bearing from one to four points on the starboard bow at various times during this period. The one exception to unanimity was the testimony of Olson's lookout who testified at a Coast Guard hearing a few days after the collision, and whose testimony was introduced at this trial by stipulation, that at what I deduced to be approximately 2:10 he saw momentarily the red light of the Leopard.

The two versions of the facts prior to the collision are irreconcilable. I think

the Leopard's witnesses were the more credible and I accept their version. I believe that the red light of the Leopard, or perhaps both sidelights, was there for the Olson to see and would have been seen if those on board the Olson were sufficiently diligent in their observations. The lookout stated that he saw the Leopard's red light for a moment; I believe that it could have been observed for a substantially greater period of time, and perhaps was. Further, I believe that the lights were not on the port bow, but close to dead ahead.

There are a number of factors which influence me to accept the Leopard's version of the facts, some of which are worthy of discussion.

First, it was the position of Olson & Co. at the trial that the Howard Olson was so far to the starboard, or seaward, of the projected course of the Leopard that Article 18 did not apply. At the Coast Guard hearing a few days after the collision, Zinkiewicz testified that prior to any danger of collision he estimated that he would be three miles off Point Sur when abeam. At a subsequent Coast Guard hearing some five months later and at the trial of the instant action, the witness increased that estimate to three-and-a-half to four miles. His attempt at the trial to explain this discrepancy was unconvincing. This increasing estimate was necessary to substantiate Olson & Co's. main contention that the Howard Olson was far to the starboard of the projected course of the Leopard since it was established that the Leopard was 3.6 miles off Point Sur two or three minutes before the collision.

The evidence was uncontradicted that the Howard Olson at 10:00 P.M., some four hours before the collision, was abeam of, and three miles off, the Cape San Martin light, which is about 40 miles south of Point Sur. She had a heading of 320° and continued on that course until her change to 310° shortly before the collision. At the trial, navigational charts were used by proctors for cargo and Luckenbach to show that if the course of 320° had been made good, the Olson would have passed abeam of Point Sur three miles off and would have been well on the port side of the projected course of the Leopard. Olson & Co. attempted to explain this adverse evidence by showing that the Howard Olson was set out from the coast by a current and failed to make good her 320° course. In support of this contention Olson & Co. pointed out that if the Howard Olson had maintained her course of 320° and the speed of eight knots which she was allegedly making at Cape San Martin, she would have passed Point Sur some time before the collision and the fact that this had not been achieved is some evidence that a current had not only reduced her speed, but had set her out from the coast. There was no substantial evidence that a current did exist which would affect the Olson as her proctors claim. The fact that she did not in fact realize her estimated speed is more logically attributable to a partial failure of engine efficiency than to a current set.

Secondly, there is the testimony of an independent witness, the mate Kittinger from the John B. Waterman, that as he viewed the two vessels on his radar screen from 2:04 until a few minutes prior to the collision they appeared to be on substantially opposite courses, with the Olson's course slightly to the westward. However, I feel that any distance between the projected courses was not sufficient to call for any other than the port-to-port passing as prescribed in Article 18.

Kittinger testified that the fact that there were two vessels approaching the Olson (the Waterman and the Leopard) was a circumstance to be considered by the Olson in attempting to make a starboard-to-starboard passing with the Leopard. However, Zinkiewicz, the Olson's mate, did not so consider it. He testified at the Coast Guard hearing, in answer to a question whether there was enough sea room to pass between the two vessels if the Olson had headed that way, that "there was plenty of room between

# 203

me and the Waterman to get a battleship or an aircraft carrier in between and then some."

■ The many contradictions of the Olson's story made it apparent to me that the Leopard witnesses presented the more credible version. For these and other reasons, I am inclined to believe that at 2:10 when Captain Snow sighted both sidelights of the Olson and the Olson's lookout caught a glimpse of the red light of the Leopard, the vessels were end on, or nearly end on, and Article 18 was applicable. The Leopard's subsequent maneuvers to her right were in compliance with that rule, whereas the subsequent actions of the Olson violated it and constituted a fault which caused the collision.

■ There has been some reference in the memorandums filed after the trial that perhaps the positions of the two vessels prior to the collision constituted a crossing situation rather than a head-and-head approach. If the Court considered only that portion of the testimony that pointed to its being a crossing situation, the conclusion that the Olson was at fault would not be changed. The Olson would then be the burdened vessel and would be at fault for failing to keep out of the way (Rule 19, 33 U.S.C.A. § 146c), for crossing ahead of the Leopard (Rule 22, 33 U.S.C.A. § 146f), and for failing to slacken speed (Rule 23, 33 U.S.C.A. § 146g).

■ Even without predicating the finding of fault on the violation of statutory rules pertaining to passing, there is sufficient evidence to find that the Olson was at fault in maintaining her course and speed when there was a risk of collision. According to the Olson's witnesses, when the Leopard was first sighted at 1:40 she was one point on the starboard bow. If a safe starboard-to-starboard passing was to be effectuated, that bearing to starboard should gradually and consistently increase. Petition of the United States, 2 Cir., 1949, 178 F.2d 243. But when the sidelights of the

Leopard became visible at a distance of from five to six miles, which would have been at approximately 2:04, they were observed to be still one point on the starboard bow. This would indicate that the vessels were on courses which presented the risk of collision. 33 U.S.C.A. § 146, subd. 2. What did Zinkiewicz do to relieve this hazardous condition? Basically his story is that at 2:15 he made a 10° course change to the left and sounded a two-blast whistle; that at 2:17 he ordered the helmsman to "keep coming left" and simultaneously telegraphed the engine room to change speed to full astern; and that the collision occurred at 2:19. Even if I found that Zinkiewicz' story as to time intervals was true, I doubt that it could be held to constitute a sufficient effort to take steps to avoid the collision. However, I am unable to rely on Zinkiewicz' estimate of the time of his orders, because I find that his first course change was somewhat less than his estimate of four minutes prior to the collision. Although the testimony is contradictory, the more reliable testimony is that the two-blast whistle was given within a minute to a minute-and-a-half prior to the collision when the vessels were at the most about 1,700 yards apart. Zinkiewicz testified that the whistle was sounded at the same time he gave the order and the evidence is uncontradicted that this was the first change of course which he made.

Zinkiewicz testified that he had taken a bearing at 1:48 and intended to take another bearing when abeam of Point Sur in order to establish his position from the coast. But in order to get an accurate measurement it was necessary to maintain his same course and speed until the vessel was abeam.

Whether the reason for the Olson's stubborn maintenance of her course without change was for the purpose of permitting her mate in charge to get another bearing when abeam of Point Sur, as is contended by cargo and Luckenbach, I do not know. Whatever the reason, the Olson after having the lights of the on-

coming Leopard in view for over 16 miles, proceeded in a straight, undeviating course toward the Leopard when it was apparent that by so doing a risk of collision was involved. The Olson's 10° course change within a minute or one-and-a-half minutes prior to the collision was too little and too late. I find this action of the Olson to be a fault which contributed to the collision.

■ Luckenbach and cargo claimants have charged that the Olson was at fault for failing to repeat the two-blast whistle when it did not receive a reply from the Leopard and for failing to give the required whistle signals to inform the Leopard of the helm order "keep coming left" and the engine room order of full astern. 33 U.S.C.A. § 147(a). If they had been given, they would have generally indicated that the Olson was maneuvering to her port. While the failure to repeat the two-blast whistle could be considered a contributing cause of the accident, I am of the opinion that the "keep coming left" and "full astern" orders of the Olson were given such a brief time before the collision that whistle signals by the Olson at that time would not have prevented the collision. The failure to give the whistle signals of the last two orders therefore was not a cause of the collision, since the vessels were committed to a collision course at that time.

■ There has been some contention that the Howard Olson was at fault in positioning her lookout on the bridge instead of the bow of the ship. There is no rule which designates the required position for a lookout, although there is substantial authority to the effect that the bow is the proper place for the lookout, especially at night. Chamberlain v. Ward, 1859, 21 How. 548, 62 U.S. 548, 16 L.Ed. 211; The Ottawa, 1866, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165; The Colorado, 1876, 91 U.S. 692, 23 L.Ed. 379; The Yoshida Maru, 9 Cir., 1927, 20 F.2d 25; Luckenbach S. S. Co. v. Societa Anonimo Parleupazione Industriale Com-

merciale (The Feltre), 9 Cir., 1942, 127 F.2d 86.

However, I am influenced by the reasoning of Puratich v. U. S., 9 Cir., 1942, 126 F.2d 914, where the Court said at page 916:

"* * * we see no possible connection between the happening of the collision and the failure of the Crosby to maintain a lookout in the forward part of the ship. The Lone Eagle was sighted as soon as her lights were turned on, and her course and position were thereafter for nearly a quarter of an hour under constant and meticulous scrutiny. In the circumstances shown, a lookout in the bow would have contributed nothing to the 'eyes or ears' of the ship."

The lights of the Leopard were first observed by the Olson's lookout at 1:40 when almost 16 miles of water separated the two vessels. From the time of first observation until the collision, the lookout had an unrestricted view of those lights and a more forward position would not have enhanced this observation. Under these circumstances I find that the Olson was not at fault in positioning her lookout on the bridge.

■ Next, the liability of the Marine Leopard will be considered. Clearly, the Marine Leopard violated the statutory rule by failing to give whistle signals when effecting course changes, and it is equally clear that this violation was a causative factor of the collision. From 2:02 until the time of the collision, the Leopard made six different course changes and neglected to sound a whistle on each occasion. 33 U.S.C.A. § 147(a) provides:

"When vessels are in sight of one another, a power-driven vessel underway, in taking any course authorized or required by sections 144–147d of this title, shall indicate that course by the following signals on her whistle, namely:—

"One short blast to mean 'I am altering my course to starboard.'

"Two short blasts to mean 'I am altering my course to port.'

"Three short blasts to mean 'My engines are going astern.'"

Conceding that whistle signals for some of the earlier changes, when the vessels were three or more miles apart, would not have been heard, three of the six course changes were made well within that distance, and if signals had been sounded the Olson would have been aware of the Leopard's intention and could have adjusted course accordingly. I have no hesitation in finding the Leopard was at fault in failing to signal her course changes, and that this fault was one of the causes of the collision.

As I have previously noted, I find that Article 18 (33 U.S.C.A. § 146b), commonly known as the head-and-head rule, was applicable. The Captain of the Marine Leopard made a like determination and testified that his course changes were effected in conformance with that rule, and I must agree. However, I feel that the Leopard was at fault in making, without whistle signals, piecemeal changes instead of one or more definite, substantial course changes. If such had been done, the Olson probably would have been aware of it and would have come to the correct conclusion as to the Leopard's contemplated course.

██ Olson & Co. contend that the statutory fault of the Leopard was so flagrant that the "major and minor fault rule" is applicable. That rule was concisely stated in Alexandre v. Machan, 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, 85:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any

reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." Accord, The Victory, 1897, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The Ludwig Holberg, 1895, 157 U.S. 60, 15 S.Ct. 477, 39 L.Ed. 620; U. S. v. Shaw, Savill & Albion Co., 2 Cir., 1949, 178 F.2d 849; TheoThilatos v. Martin Marine Transp. Co., 4 Cir., 1942, 127 F.2d 1016; General Sea Foods Corp. v. J. S. Packard D. Co., 1 Cir., 1941, 120 F.2d 117.

I feel that the facts of this case do not show such an extreme variance of degree of fault as to support the application of the rule. Granting that the Marine Leopard's failure to sound change of course signals was a serious fault and was sufficient in itself to cause the collision, the same charges could appropriately be made against the Howard Olson in failing to conform to the head-and-head rule and also for stubbornly maintaining course and speed when the constant bearing disclosed a risk of collision.

Both vessels involved in the collision were equipped with radar. The officer in charge of each ship testified that it would have been possible to accurately chart the course and speed of the other ship by using the radar. Yet neither ship used its radar for that purpose. The Olson radar was not even placed in operation and the Leopard radar was used only to make observations of the position of the Olson from time to time.

Although the night was clear and each saw the lights of the other for a considerable period of time, the fact that those lights maintained an almost constant bearing on the respective bows should have given some indication that there was a risk of collision. Whatever course each thought the other was pursuing, the collision is stark evidence that their estimation was incorrect. However, if either had taken the trouble to plot the course of the other by radar, the fact that there was a risk of collision would have been all the more apparent to

both and corresponding adjustments in course could have been made. This would be especially true in the case of the Howard Olson. The mate Zinkiewicz was adamant in his contention that the situation called for a starboard-to-starboard pass. Perhaps his conviction would have been shaken had a radar plot disclosed the Leopard's five course changes to her right.

While I hesitate to go so far as to hold that each vessel was at fault for failing to utilize the full potentials of its radar, I do believe that Snow and Zinkiewicz' actions in this regard constituted poor seamanship.

■ Little discussion is necessary in passing on the petition of Olson & Co. for limitation of liability. 46 U.S.C.A. § 183 provides in substance that the liability of the owner of a vessel shall not exceed the value of the owner's interest in the vessel and her pending freight if the injury or loss giving rise to the liability was incurred without the privity or knowledge of the owners. It appears to me that the faults committed by the Howard Olson which contributed to the cause of the collision were faults in seamanship by the mate in charge at and prior to the time of the collision, and there is no substantial evidence connecting the owner to these faults within the meaning of this Code Section.

Proctors for cargo claimants contend that Olson & Co. has not complied with. the statutory requirements for limitation of liability. I see no basis for this contention, and the petition should be granted.

Proctors for cargo to prepare such findings of fact, conclusions of law and decree for that portion of the litigation which culminated in a finding of mutual fault as may be appropriate. Proctors for Olson & Co. to prepare such findings of fact, conclusions of law and decree for that portion of the litigation which related to the petition for the limitation of liability as may be appropriate.