## THE BELGIAN KING.

HUNTER et al. v DAMPSKIBSSELSKABET TELLUS et al. SAME v. DAMPSKIBSSELSKABET TELLUS. CALIFORNIA & ORIENTAL S. S. CO. v. SAME.

(Circuit Court of Appeals, Ninth Circuit. October 19, 1903.)

No. 930.

1. COLLISION—STEAM VESSELS IN FOG—SPEED.

A steam vessel in a dense fog is bound to observe unusual caution, and to maintain only such a rate of speed as will enable her to come to a standstill by reversing her engines at full speed before she could collide with a vessel which she could see through the fog.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered in a cause for collision between the steamships Tellus and Belgian King in the Pacific Ocean at night, in a dense fog, and the Belgian King *held* solely in fault for violation of the navigation rules in failing to go at a moderate speed after entering the fog, or to stop her engines on hearing the fog signals of another vessel nearly ahead and whose position was unknown; and also for misunderstanding the signals of the Tellus, which was in all respects navigated with care and in conformity to the rules, having come to a stop before the collision.

---

¶ 1. Collision rules—Speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.

See Collision, vol. 10, Cent. Dig. § 170.

Appeals from the District Court of the United States for the North-
ern District of California.

For opinion below, see 113 Fed. 525.

The several libels herein set forth, arising out of one event, namely, a
collision between the Norwegian steamship Tellus and the British steamship
Belgian King, were consolidated by order of the court below, and tried upon
one hearing. Several decrees were entered by the District Court, and, by
stipulation of the respective parties, appeals from the several decrees were
presented to this court upon one record.

It is alleged, in the amended libel of G. B. Hunter and the Wallsend Slip-
way Company for salvage services rendered to the steamship Tellus, that
they are the sole owners of the British ship Belgian King, a vessel of about
2,170 tons register, and at the time mentioned of the value of about £25,000
sterling; that on the 17th day of July, 1900, the Belgian King, then being
in ballast, left the port of San Francisco, bound to the port of Seattle, in the
state of Washington; that between 10 and 11 o'clock p. m. of that day, when
about 25 miles to the southward and westward of Point Arena, on the coast
of California, and 7 miles distant from land, dense fog then prevailing, a
collision took place between said Tellus and the ship Belgian King, the former
being laden with a full cargo of coal, and bound from Comox, in British
Columbia, to the port of San Francisco; that the collision occurred without
any negligence on the part of the officers and crew of the Belgian King; that
both ships sustained damage by reason of said collision, the Tellus having
a large hole made in her port bow between her collision bulkhead and bulk-
head No. 1, through which the water in large quantities entered, and, fear-
ing that the ship would sink almost immediately, of which there was great
danger, her entire company went on board the Belgian King; that the Bel-
gian King remained by the Tellus until the following day; that on the morn-
ing of that day, the Tellus being still afloat, but having a great deal of water
in her, and still leaking, and in danger of sinking, the master of the Tellus
requested the master of the Belgian King to take the Tellus in tow for the
purpose of assisting her to the port of San Francisco as speedily as possible;
that thereupon the Belgian King made fast to the Tellus with 120 fathoms
of a 4-inch steel hawser, and towed her until she arrived at a point about
three miles distant from the entrance to the Bay of San Francisco, when the
hawser parted; that, the sea being then smooth, the master of the Tellus
did not deem it necessary for the Belgian King to again make fast to her,
and started the Tellus ahead under her own steam; that the Belgian King
accompanied her in order to render any assistance needed, and so continued
until about 8 o'clock p. m. of said 18th day of July, when the vessels arrived
at an anchorage in the said harbor, at a point six or seven miles from where
said hawser parted. It is alleged that the Tellus was and is in her damaged
condition of a value of £18,000 sterling, or thereabouts, and the value of her
cargo of coal not less than $21,000; that the said ship was so seriously in-
jured and damaged as to render her liable to sink at any moment, and, to-
gether with her cargo, become a total loss before she could, by her own
unaided efforts, reach a place of safety, and that it would have been ex-
tremely dangerous to the lives of her officers and crew to remain on board
of her, for the purpose of attempting to navigate her to a place of safety,
without the immediate presence and aid of the Belgian King; that by reason
of the premises the libelants are entitled to recover against the said Tellus
and her cargo a reasonable salvage reward for the services alleged to have
been rendered.

The owners of the Belgian King also libel the steamship Tellus, her
tackle, apparel, and furniture, for the amount of damages sustained by the
Belgian King in said collision, in the sum of $14,000. It is alleged in the libel
that "at about 45 minutes past 10 o'clock on the night of said 17th day
of July, a long blast of a steamer's whistle, which afterwards proved to be
that of the steamship Tellus, was heard, apparently about three points off
the starboard bow of the ship Belgian King, whereupon the engines of said
Belgian King were immediately put to slow, and she proceeded ahead at a
rate of about three knots an hour, which was as low a rate of speed as was

consistent with good steerageway, which speed was maintained until her engines were reversed as hereinafter mentioned. In a few minutes thereafter, two blasts in quick succession of the whistle of the approaching vessel were heard, which were interpreted by those on board of the Belgian King to mean: 'I am directing my course to port.' Then the helm of the Belgian King was immediately put to starboard, and two blasts of her whistle were sounded, indicating: 'I am directing my course to port.' In a short time after, the approaching vessel again gave two blasts of her whistle, which appearing to be close by, the engines of the Belgian King were stopped and reversed full speed, and three blasts of her whistle, indicating, 'My engines are going at full speed astern,' were sounded. Shortly after, the masthead light of the approaching vessel was sighted about two points off the starboard bow of the Belgian King, and then her red light came in view, and then, in a time so short thereafter as to render it impossible for those navigating the Belgian King to adopt any measures to avoid it, a collision took place between the two vessels, the Belgian King coming in contact with the port bow of the Tellus, which was then being navigated across the bow and course of the Belgian King, in consequence of which the Belgian King was extensively damaged, that is to say: Eighteen plates on her bows broken, bent or cracked; eight frames broken; breast hooks bent; stringers broken; collision bulkhead bent, and the bulkhead frame crushed and broken; some of the plates were cracked below the water line so that the forward compartment filled with water; and doing other and extensive damage."

The California & Oriental Steamship Company also libel the steamship Tellus, her tackle, apparel, and furniture, for the amount of damages sustained by it, as charterer of the Belgian King, in the loss of contracts and delay of the ship for repairs after said collision, in the sum of $18,694. The navigation of the Belgian King is described in the same terms as those employed in the libel filed by the owners of the Belgian King.

In answer to each of these libels the Tellus Steamship Company admits that the collision occurred, that the Tellus was damaged thereby, and that it was towed by the Belgian King to San Francisco. It denies that the Tellus was in a sinking condition at any time, but avers that as water was coming into the ship, and it being nighttime and foggy, they were not satisfied that it was safe to remain on board; but that in the morning, when the true condition of the ship could be ascertained, they found the ship in no danger, and returned to her. It is denied that the Tellus was in serious danger at any time, except in the event that she should meet with heavy weather. It is denied that the Tellus was navigated in violation of the rules of navigation, or otherwise than with the greatest care and skill, and avers that the officers of the Belgian King were solely to blame for the collision, by reason of the high speed which was maintained almost to the moment of collision, and by reason of their lack of knowledge of the meaning of signals or their correctness in interpreting them. It is prayed that the various libels against the Tellus be dismissed.

At about the time of the filing of the libels against the Tellus, the Tellus Steamship Company filed a libel against the Belgian King, her tackle, apparel, and furniture, for the amount of damages sustained by the Tellus by reason of said collision, and for the loss resulting from the deprivation of the use of the vessel while being repaired, in the total sum of $45,000. The libel describes the movements of the Tellus on the night of the collision, as follows: "At half past 10, the fog having then settled down, the master ordered that the engines be run at slow speed, the said vessel then making about three knots an hour. About this time a long blast from a steam whistle was heard about ahead of the Tellus, and at some distance away, which whistle was immediately answered by a long blast from the Tellus. A similar long blast was again heard and again answered, and like signals were kept up, all at an interval of about two minutes between blasts, and all indicating an approaching steamship. That as soon as the master of the Tellus discovered from the said whistles that the said approaching steamship was still ahead of the Tellus, and that she could not be far away, he ordered the helm to port, and gave a short blast on the steam whistle to indicate to the approaching ship the fact that the Tellus was being directed to the starboard.

That the approaching steamer again gave a long blast, which as before was answered, and was, after about 30 seconds, followed by a short blast from the Tellus indicating a continued turning by her towards the starboard. That thereupon the engines of the Tellus were stopped, and so continued until the approaching steamer, which afterwards proved to be the steamship Belgian King, of about 2,000 tons, bound from San Francisco to Seattle, gave two short blasts, and immediately three longer blasts. Immediately the engines of the Tellus were reversed at full speed, so that said vessel's way was actually stopped. In a short time the lights of the Belgian King came into view, said vessel bearing about one and one-half points on the bow of the Tellus, and in about one-half of a minute the Belgian King struck the Tellus on the port bow, cutting deeply into the same down to and below the water line, and breaking her frames, beams, plating, and decks from the afterpart of the collision bulkhead to the corner of No. 1 hatch, a distance of about 10 feet, and otherwise seriously injuring her. * * * That for a long time prior to the collision aforesaid, and up to the occurrence of the same, the master and officers of the said Belgian King, notwithstanding the fact that a thick fog was prevailing, and that the said steamship was all of the time in said fog, and that it was impossible to see more than a very short distance ahead, were proceeding at a high rate of speed, and, notwithstanding that they knew from the signal blasts that were blown by the Tellus that another vessel was in close proximity to her, and that there was risk of collision unless due precaution should be had on her part, they failed to stop the engines of said ship until they could ascertain the location of the Tellus, by reason whereof, although the Tellus had been and was stopped, the said Belgian King came into collision with said Tellus; all of which acts on the part of the said master and crew of the Belgian King were negligently done, and with lack of proper care and skill in navigation."

The District Court held that the collision must be attributed to the fault of the Belgian King in not stopping when she became aware that she was in close proximity to the Tellus, instead of moving ahead at a low rate of speed. The libels against the Tellus were therefore dismissed, and a decree entered for the Tellus Steamship Company in its cross-libel against the Belgian King in the sum of $32,622.14. From these decrees appeals have been taken to this court.

Milton Andros, for appellants.

Page, McCutchen & Knight, Chas. Page, E. J. McCutcheon, and Samuel Knight, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

The assignments of error relate to the various findings and conclusions of the court, upon which its holding was based that the legal responsibility for the collision in which the injuries were received was upon the Belgian King. As an appeal in admiralty causes brings both the law and the facts before the appellate court for review, the principal question for consideration is whether either vessel was solely in fault in causing the collision upon which the libels in controversy are based.

It is undisputed that the steamship Belgian King left the port of San Francisco, in ballast, on the afternoon of July 17, 1900, bound for the port of Seattle, in the state of Washington; that the steamship Tellus was laden with coal, and was nearing the end of her voyage from British Columbia to San Francisco; that a dense fog set in about 6 o'clock in the afternoon, and continued until after the collision; that the steamships collided at some time between 10:40 and 11 p. m. of that day, at a point some 16 to 26 miles south of Point Arena;

that the lights on both steamers were in proper place and condition; that proper lookouts were on duty, and that both steamers were properly manned as to the number and degree of officers in charge; that the Belgian King struck the Tellus on the port bow, piercing the hold of the Tellus to the distance of 16 feet, and cutting her down to about 10 feet below the water line; that the Belgian King was but slightly injured, her sharp stem not being damaged at all.

The main controversy turns upon the speed of the two vessels just prior to the collision, the interpretation of signals given by the respective steamers, and the maneuvers of the steamers upon those signals. The captain of the Tellus was on the bridge at and for some time before the occurrence of the collision. He testifies that at about half past 10 of that evening the fog became very thick, and he slowed his engines down to "slow speed," or about three knots an hour; that he had been sounding his regular fog whistle, a long blast every two minutes, all the evening; that at 10:32 p. m. he heard a long whistle right ahead, a good way off; that he answered it with a long whistle; that he heard three long whistles from the other ship at intervals of two minutes, and, being then sure of the bearing, he ported the helm 45 degrees, with the object of turning his vessel to starboard, at the same time giving the direction signal that he was going to starboard, consisting of the regular fog whistle of one long blast followed in 30 seconds by a short whistle; that he received one long whistle from the other ship after that, about half a point on the port bow; that he heard nothing for three-quarters of a minute after that, so stopped his engine and repeated the signal of one long blast with a short one 30 seconds thereafter; that he counted the seconds between the blasts; that he then heard two short whistles from the other ship, followed almost immediately by three short ones, which he understood to mean that the other ship was starboarding its helm and reversing its engine; that at this time the Tellus had been drifting under a stopped engine for about five minutes; that as soon as he heard the two short blasts from the other ship he reversed the engines of the Tellus, and in about two minutes sighted the masthead light of the other ship, about two points off the port bow; that the green light came in view immediately after, and the collision took place about one minute afterwards. He testifies that the Tellus was "about dead" when the two ships met, but that the other ship must have had a good motion on. This testimony was corroborated by Olsen, the lookout on duty on the Tellus at the time, and by Berger, the second mate, who was on the bridge with the captain, and attended to the whistle. The testimony of the engineer on duty at the time corresponds with that of the captain, as to receiving orders for the slowing and stopping of the engines, and soon after reversing them.

The captain of the Belgian King was also on the bridge of his vessel at the time of the collision, and for some hours before. He testifies that at about 6:45 p. m., and again at 7:45 p. m., they had heard the whistles of another vessel, and in each instance had stopped the engines until the sound of the whistles was definitely located, when he put the vessel at half speed again; that he kept the vessel at half speed until 10:45 p. m.; that "half speed" was 8½ knots, in ballast; that at 10:45

p. m. he heard another steamer's whistle off the starboard bow about three points; that he then put the engines to "slow," and continued sounding the regulation fog whistle every two minutes; that he then heard two blasts from the other vessel, both appearing to him to be pretty long and of about the same length; that he imagined from these whistles that the other vessel was putting its helm to starboard and directing its course to port; that he then stopped the engines of the Belgian King, put the helm to starboard, and blew two whistles; that he then heard another two blasts from the other vessel, in the same direction, but much nearer; that he then reversed his engines full speed, and gave three blasts of the whistle; that shortly after that he sighted the masthead light of the other vessel about four or five hundred feet away, about two points on the starboard bow, and then saw the red light; that he gave an extra ring in the engine room to increase the sternway, if possible, and blew three blasts of the whistle again; that in about two minutes after the light was sighted the vessel struck the Belgian King on the starboard bow and heeled her over to port; that the momentum of the other vessel coming against the starboard bow of the Belgian King lifted her bow up a certain distance, and in recovering herself the Belgian King came down upon the Tellus, smashing into her hull. He testifies that the Belgian King had about come to a standstill when the vessels came together; that she backed away, and cleared the Tellus in about two minutes after striking.

The third officer, Lord, who was on the bridge with the captain, testifies that he heard the long blast of the other vessel three or four times on the starboard bow, and then heard the regulation two short blasts, signifying that the vessel was going to port; that his own vessel then stopped and starboarded, giving two short whistles, and after that he heard two blasts again, very close on the starboard bow; that they then put their ship full speed astern, giving three blasts of the whistle; that about two minutes after hearing the last two short blasts he saw the masthead light, and a few seconds later the port light.

The lookout on the Belgian King was a Chinaman, who testifies that he went on duty at 10:30 p. m., and five, six, or seven minutes after that he heard a whistle on the starboard side of his vessel; that he heard nothing else for five or six minutes, when he heard two short whistles, and at the same time saw the masthead light of the vessel; that when he heard the first whistle he reported it to the officers, and they then blew the whistle of the Belgian King three times; that when they saw the lights they blew the whistle again three times, and three more right after that.

The quartermaster on duty at the time was also a Chinaman. Soon after 10:30 p. m. he heard one long whistle, which was answered by the Belgian King. He heard nothing more for five or six minutes, when at the same time, practically, he saw the lights of the other vessel, heard two short whistles, heard the Belgian King give three short whistles, and received orders from the captain to put the helm hard astarboard; that the course of the Belgian King was not changed until the lights of the other ship were seen, and only a minute or two then elapsed before the collision.

The chief engineer of the Belgian King testifies that the engines were at half speed at 9:15 p. m., slow at 10:45, stopped and full astern at 10:50, and the ship stopped entirely at 10:55, according to the log slate kept by him; that the engine was going astern for two minutes before the collision, and continued going astern for three minutes thereafter.

Article 16 of the act of August 19, 1890, as amended May 28, 1894 [U. S. Comp. St. 1901, p. 2868 (see 28 Stat. 1250)], prescribing regulations for preventing collisions at sea, provides as follows:

"Every vessel shall, in a fog, mist, falling snow, or heavy rain storm, go at a moderate speed, having careful regard to the existing circumstances and conditions.

"A steam vessel hearing, apparently forward of her beam, the fog-signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over.

"Steering and Sailing Rules.

"Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass-bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

"Article 18. When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other."

Did the vessels act in accordance with these regulations? There is evidence tending to show that the Belgian King had been going at a greater rate of speed than "half speed" prior to the hearing of the fog whistle of the Tellus at 10:45 p. m. But accepting the testimony of the captain of the Belgian King that his vessel was proceeding on her course at half speed, or at the rate of 8½ knots per hour; that between 10:25 and 10:30 p. m. the fog had become dense and "had shut in thick"; and accepting the testimony of the captain of the Tellus that at half past 10 o'clock his vessel also encountered the fog, and that the engines of his vessel were brought down to "slow speed," or three knots per hour, which speed, the captain testified, was the lowest at which steerageway of the ship could be maintained; and that seven or eight minutes later, according to the engineer of the Tellus, the engine was brought to a stop—we have this situation: From the time the dense fog set in at 10:30 p. m. until the Belgian King was made aware of the approach of the Tellus, at about 10:45 p. m., the Belgian King was going at 8½ knots per hour, and the Tellus at 3 knots per hour, the slowest rate consistent with the maintenance of steerageway; that this speed was maintained for 7 or 8 minutes, when the engine was stopped. It is evident from this statement of the testimony that the Belgian King was not during this time going at a moderate rate of speed, having careful regard for the existing circumstances and conditions. This is determined partly by the inference to be drawn from the fact that the Tellus under the same conditions reduced her speed to 3 knots per hour, and after 7 or 8 minutes stopped her engine, while the Belgian King maintained a speed of 8½ knots per hour; but it is also determined by the fact that, while the Tellus was being navigated at the moderate rate of speed required by law, the speed of the Belgian King was maintained at such a rate that she could not and did not

stop in time to avoid a collision after the Tellus came in sight. The rule is that a vessel in a dense fog is bound to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill by reversing her engines at full speed before she could collide with a vessel which she could see through the fog. The Colorado v. The H. P. Bridge, 91 U. S. 692, 702, 23 L. Ed. 379; The Nacoochee v. Moseley, 137 U. S. 330, 339, 11 Sup. Ct. 122, 34 L. Ed. 687. That the Tellus observed this rule, and that the Belgian King did not, is established by the testimony as to the rate of speed each vessel maintained prior to the collision, and the fact that at the time of the collision the Tellus had stopped and the Belgian King had not; also, by the character of the wound inflicted upon the Tellus. This was the finding of the court below, and is supported by the evidence. not only did the officers and crew of the Tellus testify that the engines of the Tellus had been stopped for some time, but the testimony of other parties, entirely disinterested, supports this presumption. Capt. C. M. Goodall, of large experience in the steamship business, examined the Tellus as soon as she was discharged at San Francisco, as a matter of general interest, and states positively that in his opinion the Tellus must have been still when the collision occurred, from the nature of the injury received. Capt. Thayer, inspector of the Bureau Veritas, inspected the Tellus as soon as she was discharged, and reaches the same conclusion. Capt. Turner, marine surveyor for the Fireman's Fund Insurance Company and for the Bureau Veritas, examined the Tellus with a view to estimating the repairs necessary to put her again in her class, and testifies that in his judgment she was lying still, or nearly so, when collided with by another vessel. Capt. Metcalfe, surveyor to Lloyd's Register of British and Foreign Shipping, surveyed the Tellus and reported upon her condition as to necessary repairs, and afterwards attended while the repairs were being made, and says, "The indications, I think, pretty conclusively point to the fact that the Tellus had no headway on her at the time," also stating that the other vessel must have had some motion. We are of the opinion that had the Belgian King when she encountered the dense fog, reduced her speed as did the Tellus, the collision would not have occurred.

The next inquiry relates to the interpretation of signals given by the respective steamers, and the maneuvers of the vessels upon those signals. When the whistle of the Belgian King was first heard, the position was sufficiently ascertainable by the Tellus to permit her to continue on her course at slow speed, and give the direction signal that she was going to starboard. Not receiving a proper response to that signal, the engines were stopped and the signal repeated, the ship drifting for some minutes before the collision. The Belgian King was going at half speed until the fog whistle of the Tellus was heard. Her engines were then put to "slow." Two blasts were heard from the Tellus, which the captain of the Belgian King understood to be of the same length, signifying that the Tellus was directing its course to port. The engines were then stopped, and the signal answered. Hearing two more blasts of the whistle much nearer, the engines were reversed, but it was too late, as in about two minutes the vessels came together. The regulations pre-

scribe one long blast, of from four to six seconds' duration, sounded at intervals of two minutes during a fog, and the signal that a vessel is directing her course to starboard is one short blast of about one second's duration. The Tellus claims to have given one long blast, followed at an interval of 30 seconds by a short blast. The captain of the Belgian King claims to have heard two rather long blasts of about the same length. It is our opinion that the captain of the Belgian King misunderstood the signals of the Tellus. He states that he understood the signals to mean that the vessel was directing its course to port. Had the blasts been long, as he stated, such an interpretation would have been incorrect. Two long blasts indicate a steam vessel under way, but stopped, while the direction of a vessel's course to port is signaled by two short blasts. When this fact was called to his attention by counsel upon cross-examination, the captain stated that such was not his understanding of the regulations, and in other particulars showed that he was not familiar with the distinctions made in the regulations between the different signals. Had the course of the Belgian King been directed to starboard, in response to the signal of the Tellus, no collision would have occurred between them.

It is charged against the Tellus that she changed her course after the fog signals of the Belgian King indicated that the two vessels were drawing together, and that she notified the Belgian King of this change of course by sound signals. This charge appears to be based upon the theory that the two vessels were on parallel courses, or nearly so, and that, without any change of course on the part of the Tellus, and signals to that effect, the two vessels would have passed each other starboard to starboard. But this view of the situation is not supported by the evidence. The course of the two vessels, when each became aware of the presence of the other, was not parallel, but crossing. The course of the Belgian King was N. W. ¼ W. magnetic, and the course of the Tellus was S. E. ½ E. magnetic. These courses were similar to the courses of the Umbria and the Iberia in The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053. In that case the captain of the Iberia heard the whistle of the Umbria two points on the port bow, and apparently a long distance away. He ported his helm and directed his course to starboard, signaling the Umbria to that effect. This course was in fact across the path of the Umbria, but the captain of the Iberia appears to have determined that by porting his helm he could cross the path of the Umbria before the latter vessel could reach the point of intersection, assuming, of course, that the Umbria was going at a moderate rate of speed. In the present case the captain of the Tellus heard the whistle of a steamer right ahead. The sound appeared to be a long way off. It was a long whistle. The Tellus answered with a long whistle. The captain of the Tellus heard three long whistles from the Belgian King at intervals of two minutes. Then, being sure of the bearings, he ported his helm and went to starboard, giving one short blast to notify the Belgian King that the Tellus was going to starboard. The Belgian King, he says, was "right ahead." It was certainly not a fault on the part of the Tellus to turn

away from an approaching vessel right ahead, and in going to starboard he took the course required of approaching vessels in sight of each other. In the case of The Umbria, the Supreme Court, commenting on the action of the Iberia in changing her course under circumstances less favorable under the apparent conditions, said:

"Under such circumstances, and in view of the fact that the exact position and course of the Umbria could not be determined, we think it would have been more prudent on the part of the Iberia not to have changed her course until the position and course of the approaching steamer had been definitely ascertained, although we should be reluctant to hold that such change of course was a fault on her part which should condemn her in a moiety of damages. There are undoubtedly authorities and some expressions of this court to the effect that a change of the helm, in ignorance of the exact position and course of an approaching vessel, is a fault, although we have never held that it would be a fault in every case presenting these conditions." (Citing cases.)

The majority of the court were of opinion that the Iberia was not in fault, while the other members of the court rested their conclusion upon the view that, even if she were at fault, such fault did not contribute to the collision. The court held that the Umbria was alone at fault.

Applying the rule of that case to the present one, we have no difficulty in reaching the conclusion that the Tellus was not at fault. The responsibility for the collision, and the damage resulting therefrom, must therefore be laid upon the Belgian King.

The decree of the District Court is affirmed.