## THE BAILEY GATZERT.

### (District Court, D. Oregon. March 29, 1909.)

### No. 4,979.

1. COLLISION (§ 82\*) — PRECAUTIONS FOR PREVENTING COLLISION — SPEED IN FOG.

 A steam vessel in a dense fog is bound to observe unusual caution and to maintain only such a rate of speed as would enable her to come to a standstill by reversing her engines at full speed before she could collide with a vessel which she could see through the fog.

 [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 170–172; Dec. Dig. § 82.\*

 Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

2. COLLISION (§ 85\*)—STEAMER AND ANCHORED DREDGE—EXCESSIVE SPEED IN FOG.

 A collision in the Willamette river in a dense fog between a steamer passing down the river at a speed of 10 to 12 miles an hour and a dredge working in the fairway *held* due to the fault of the steamer because of her excessive speed, which was such that, although she reversed as soon as the dredge could be seen, she could not be stopped in time to avoid the collision. The dredge *held* not in fault; it appearing that she was ringing her bell at intervals of not more than a minute.

 [Ed. Note.—For other cases, see Collision, Cent. Dig. § 166; Dec. Dig. § 85.\*]

In Admiralty. Suit for collision.

Williams, Wood & Linthicum and William C. Bristol, for libelant. Carey & Kerr and Harrison Allen, for respondent.

WOLVERTON, District Judge. On the morning of November 6, 1907, the libelant was engaged in deepening the channel of the Willamette river, at a point nearly opposite the head of what is known as "Willamette slough." The work was being prosecuted by means of the dredge Portland. It was found necessary, for the convenient and successful doing of the work, to anchor the dredge directly in the fairway. This was done by means of a spud and anchors, attached to cables on board. The vessel in its operation swung forward and back; the spud acting as a pivot in a radius of 150 feet. While so anchored and in operation, and being in position at an angle with the channel of the river, she was run into and sunk by the steamer Bailey Gatzert, while descending the river on her usual trip plying between Portland and The Dalles. This libel was brought to recover damages for the injury thus sustained to the dredge. For cause of recovery it is alleged that:

"Notwithstanding the fact that said morning was foggy, the Bailey Gatzert, up to the instant of the collision, was being navigated by her master at a high rate of speed, namely, full speed, and although the bell of the Portland was being rung at regular intervals, as required by law, the master of the Bailey Gatzert failed and neglected to observe the bell of the Portland, and himself navigated the Bailey Gatzert at such a high and dangerous rate of speed in said fog that when the Portland came into the view of the Bailey Gatzert he failed to check the headway of the Bailey Gatzert and collided

with the dredge, causing said dredge to sink within a few minutes. Said collision was occasioned solely through the fault of the Bailey Gatzert and of her master in the particulars aforesaid, and the Portland and those in charge of said vessel in no respect contributed to the collision."

The owner of the respondent claims damages by cross-libel against the Port of Portland because of the collision. By this it is charged, in effect, that notwithstanding the dredge Portland was anchored in the fairway, and the morning was foggy, no fog bells were rung on board the dredge in accordance with the law or the regulations of the United States inspectors of steam vessels for inland waters of the Pacific Coast, nor was any other signal or warning given, nor did the Port of Portland keep or provide a proper lookout and watch on board the dredge, by reason whereof, the Bailey Gatzert not having been warned of the presence of the dredge in the fairway, the collision occurred, without fault or negligence· of the cross-libelant.

These averments of the libel and cross-libel, with their denials, present the primary issues in the cause. The simple inquiry therefore is: Whose fault was it that brought on the collision?

F. H. Sherman, the commander of the Bailey Gatzert, made the following report of his trip on the occasion of the collision, under the head of "Remarks:"

"Thick fog. Calm. Left Portland 7 a. m. Fog was very thick. Went very slow to St. Johns. Then it commenced to clear. Could see both shores. Left Linnton at 8:09 a. m. Not a sound was heard before then. The fog had shut in again. The lookout reported dredge ahead. I immediately stopped. Then I heard a bell ring. I saw the dredge and gave a backing bell. When I saw the dredge she was not over 200 feet ahead. We hit her with our stem almost head on and took about four feet of the corner off."

I interpret this·to mean that the Bailey Gatzert was running in a thick fog at the time of the accident, and that immediately when the dredge was reported ahead the commander heard a bell ring. This is in accord with the commander's testimony, wherein he says:

"I did not hear anything until after the lookout reported the dredge ahead. Then the bell rang."

This, without more, establishes the fact that a bell was rung at least at that time on the dredge; but the testimony of other witnesses, who were in a position to hear for several minutes just prior to the collision, shows quite clearly that the bell on the dredge was being rung at intervals of about a minute, and in apparent answer to signals of approaching boats. The bell was a large ship's bell. The lookout on the Wauna, passing up stream at the time, heard it distinctly in answer to her signals, and also heard it while the Bailey Gatzert was approaching downstream and sounding her whistles. So of two of the officers—the pilot and captain—of the Wentworth, which passed down but little ahead of the Bailey Gatzert. They heard the bell distinctly at least three times before passing the dredge, in answer to the Wentworth's signals, and they heard it after passing. Two fishermen heard the bell immediately prior, and the officer on board the dredge testifies that he rang the bell after the fog settled in, in answer to all signals from approaching vessels, whether passing up or down stream, and that the frequency with which the bell was rung was about once a

minute, continuing for about five seconds at each time. While the officers and passengers on the Gatzert may not have heard this bell ring more than the one time, and that immediately after the dredge was sighted, yet the positive evidence of many witnesses who did hear it at reasonable and proper intervals is much more convincing and satisfactory that the bell was so rung than the negative testimony that it was not. I think there can be no question that the bell on the dredge was rung at proper intervals during the approach of the Bailey Gatzert, and for several minutes at least before the collision. That a thick fog was prevailing is conceded. When the dredge was first discovered from the Bailey Gatzert, it is probable that the Gatzert was within 100 feet of her. The commander of the Gatzert says in his report that she was not over 200 feet ahead. In his testimony he says the dredge was from 100 to 150 feet ahead, but others on board the Gatzert give the distance as about 100 feet or less.

Now, as it relates to the speed at which the Gatzert was running when the dredge was sighted, her commander testifies that she was running at half speed, and had been since passing St. Johns. She was loaded, and in that condition made about 15 miles per hour. At half speed her rate was nine miles or about. The current of the stream was running out at the time. There is, however, a sharp conflict between the testimony of the commander and that of the engineer on this vessel. The latter testifies that a minute and a half or two minutes before the collision he received a signal from the commander to run full speed ahead, and that he had opened or was opening the throttle of the engine, and the boat was gathering toward the full-speed limit. The commander denies that he gave such a signal, but I incline to the view that it was given. Whether the commander gave it or not, however, the boat was at that time speeding up, and the commander should have been apprised of it by the quiver or motion of the boat, and he allowed her to continue in that way. The boat was therefore increasing her velocity from half speed to full speed ahead, and was probably running at a rate of from 10 to 12 miles per hour, with the current of the stream in her favor. When the dredge was sighted, the engine was reversed, and was so reversed when the collision took place, so that it must be that the speed of the vessel was checked somewhat. The speed, however, thus checked, was sufficient by the impact with the dredge to drive her bow into the dredge for a distance of from 8 to 14 feet, encountering on the way a number of heavy timbers, ranging in size from 12x12 inches to 14x14. These were broken and parted, causing a rent in the stern of the dredge, from which she sank at once. There can be no doubt therefore that the Gatzert was running at a considerable rate of speed, and with great force, so that a collision with another craft would be necessarily attended with great injury and damage.

It is a rule of navigation that:

"A vessel in a dense fog is bound to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill by reversing her engines at full speed before she could collide with a vessel which she could see through the fog." The Belgian King, 125 Fed. 869, 876, 60 C. C. A. 451.

This case was decided by the Court of Appeals in this circuit, and is binding upon this court. Other adjudications, however, are to the same purpose: The State of Alabama (D. C.) 17 Fed. 847; The Bolivia, 49 Fed. 169, 1 C. C. A. 221; The Michigan (D. C.) 63 Fed. 295; The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123; The Kentucky (D. C.) 148 Fed. 500.

The rule is both reasonable and wholesome, and especially does it have application to navigation upon the waters of a narrow channel like that of the Willamette river from Portland to its mouth, where many vessels are plying constantly. The commander of the Gatzert is manifestly chargeable with grave negligence in permitting his boat to be navigated at the rate of speed she was running at the time. It was impossible for him to have brought his vessel to a stop in so short a distance as he was able to sight another vessel in the thick fog then prevailing. As it was, her engines were promptly reversed, but it seemed to check her but slightly before she collided with the dredge. Prudent navigation under the rule would have prevented the accident.

The next inquiry is: Was the dredge guilty of negligence in not ringing her bell as required by the government regulations?

Some question was made touching the position of the bell as not well calculated to give warning when rung. It was suspended near the front end of the boat, and in the clear above the hurricane-deck by from 14 to 17 inches, so that there was nothing to obstruct the sound from any direction. It could not therefore have been more advantageously placed without suspending it at a much greater height, which is not usual. The proofs indicate that the bell was being rung at regular intervals, as vessels were approaching as indicated by their signals. Such was the case as it concerned the Gatzert. Whether the bell was rung at all times while fog prevailed or not could not affect the case. The negligence in that respect, if the dredge was so negligent, could not have in any way conduced to the collision in question, because the bell was ringing at appropriate intervals while the Gatzert was approaching.

Cross-libelant also complains that the libelant failed to keep a watch or lookout upon the dredge. It is in evidence that Cosgrove, who was charged with the duty of ringing the bell, was also required to keep a lookout for approaching vessels. He had supervision also of some men about the deck. All these duties he was endeavoring to perform. He testified that, during the approach of the Bailey Gatzert, he was ringing the bell at intervals of about one minute, and that when not so engaged he kept a lookout for other vessels. He could not see up the river when ringing the bell, because of his position behind the upper deck, but he went from side to side on the promenade deck, and by that means kept watch in every direction. Here again, however, if it be the case that the duties of the lookout were not so fully observed as the government regulations required, it is manifest that had such lookout been on the best possible position on the dredge he could not have discovered the Gatzert sooner than the Gatzert's watch discovered the dredge, and this was all too late to avoid the

collision, so that any supposed dereliction of the watch did not, and could not, contribute to the accident, and therefore could not affect the result of the controversy. It is said that a watch could have discovered the approach of the Gatzert from her signals, and could, by a direction, have required the bell to be rung more vigorously, so that it would have served to warn the Gatzert of the dredge's presence in the channel. The proof is satisfactory, however, that the bell was rung at appropriate intervals and in answer to the signal of the Gatzert, which was heard by Cosgrove, and this was all that was required by the regulations. Even a watch on the dredge could not anticipate that an approaching vessel, made known by her signals, was going to run into his vessel, and hence a more vigorous action could not be required of him or the bellman than is usual in such cases.

From these considerations I conclude that the fault conducing to the collision was entirely with the Bailey Gatzert.

This leaves but one further question to be considered, which is the amount of damages sustained by the dredge because of the collision.

The testimony on the part of the libelant shows that the dredge sustained injuries to the amount of $18,058.28. I file herewith an itemized statement thereof.

I have had some doubts as to whether the entire amount should be allowed against the Gatzert, as the sum claimed seems to be very large, yet there has been no evidence offered reasonably reliable in character to countervail the testimony of the libelant upon the subject. The estimate of G. H. Thayer, marine engineer, has been offered, showing the cost of repair of main engine and pumps, boilers and boiler settings, and auxiliary machinery, which differs significantly from the cost of repair of these appliances as shown by libelant's testimony. There is not included in this estimate, however, the damage to the electric lighting plant and the machinery supplies, and it is very difficult to make the proper comparison so as to arrive at the true difference in the cost of repairs made by libelant and Mr. Thayer's estimate. An estimate has also been introduced in evidence tending to show that the carpenter work could have been done for much less, but this estimate does not include all the items covered by the carpenter work, nor all the work which was actually done by the libelant in repairing the dredge, and necessary thereto for putting her in the condition she was in prior to the collision.

Another witness was called, who testified that he would have been willing to raise the dredge for the sum of $2,500; but his testimony is not reliable, because of the fact that he supposed the vessel was of about 400 tons weight, when in fact it is 700 tons or above.

On the whole therefore I conclude that the libelant is entitled to recover the full amount of its claim, namely, $18,058.28.