## BURKE v. UNITED STATES. OLSON v. SAME. SLOVARP v. SAME.

(District Court, D. Oregon. August 2, 1926.)

Nos. 9657, 9658, 9715, 9716.

**1. Collision ⬤82(2).**

Vessel *held* at fault, under International Rules, art. 16 (Comp. St. § 7854), for proceeding at unreasonable speed in dense fog, on showing that momentum carried her out of sight of schooner after collision.

**2. Collision ⬤80.**

Schooner hovering about lightship during dense fog *held* not at fault for collision.

**3. Collision ⬤133.**

$7,500 will be allowed for loss of schooner, purchased for $3,000 and later rebuilt and overhauled at expense of $4,500.

**4. Death ⬤95(2).**

Widow and five year old daughter of seaman *held* entitled, under Death on High Seas Act (Comp. St. §§ 1251½–1251½g) to $15,000 for death of husband 31 years old, with earning capacity of $2,000 to $3,000 per year.

**5. Death ⬤95(2).**

Four minor children *held* entitled, under Death on High Seas Act (Comp. St. §§ 1251½–1251½g) to $12,000 in equal shares for death of father, 49 years old, with earning capacity of $2,000 to $3,000 per year.

In Admiralty. Separate libels by J. R. Burke, doing business under the assumed name of the J. R. Burke Fish Company, by Clara E. Olson, administratrix of the estate of Einar Olson, deceased, and by Emil P. Slovarp, executor of the estate of Eldor Neilsen, also known as Eldor Nelson and Nelsen, against the United States. Decrees for libelants.

Carey & Kerr, Chas. A. Hart, and M. K. Holland, all of Portland, Or., for libelants Burke and Olson.

H. S. McCutchan, of Portland, Or., for libelant Slovarp.

Erskine Wood, of Portland, Or., for the United States.

BEAN, District Judge. This is an action growing out of the collision of the steamship West Nomentum with the fishing schooner Nenamosha near the Columbia River Lightship on June 25, 1925, in a dense fog.

The West Nomentum is 410 feet long, 53 feet beam, and a gross tonnage of 5,652 tons. The Nenamosha was a gasoline propelled schooner, 54 feet long, 14 feet beam, and 22-ton capacity. She was engaged in fishing for halibut along the Oregon coast. Her crew consisted of four men, who were interested in her operation and the profits of the venture.

On the afternoon of the accident the Nenamosha left the fishing grounds, with five tons of fish and her fishing tackle aboard, bound for the Columbia River. Some time before she reached the lightship she ran into a fog so dense that she could not safely enter the river, and, after picking up the lightship, hovered near it for the night.

The West Nomentum was proceeding from San Francisco to Portland, and when near the lightship ran into and capsized the fishing schooner, causing the death of two of her crew and the loss of the vessel, her cargo, and fishing tackle. The collision occurred so near the lightship that the cries of the shipwrecked men were heard on board the lightship, and two of them were picked up by the lifeboat from the ship.

It is claimed on behalf of the libelants that the West Nomentum was proceeding along at an unreasonable rate of speed in the fog, and had no lookout on watch at the time of the collision. The collision occurred at 11:49 p. m., or a few seconds prior thereto. The captain and three of the officers of the West Nomentum were on the bridge at the time. She was going full speed ahead at 11:48, and at a rate of from 8 to 10 knots an hour. As she was expecting to pick up a pilot, an order half ahead was given at 11:48, and less than a minute thereafter the mastlights of the schooner loomed up in the fog, about two points off the starboard bow and about a ship's length away. A stop and full astern order was immediately given, but too late to avoid the collision, and the West Nomentum passed out of sight and hearing of the schooner and her crew before the lifeboats could be lowered.

[1] Article 16, International Rules, provides that "every vessel shall in a fog, mist or falling snow, or heavy rainstorm, go at a moderate speed, having careful regard to the existing circumstances and conditions." Comp. Stat. § 7854. This rule has been the subject of considerable discussion by the courts, and text-writers. In The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053, it is said: "The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to

stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill, until the course of each was definitely ascertained."

The same doctrine was announced in substance in The Chattahooche, 173 U. S. 540, 19 S. Ct. 491, 43 L. Ed. 801; The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687; The Belgian King, 125 F. 869, 60 C. C. A. 451; The Sagamore, 247 F. 743, 159 C. C. A. 601. It is known as the "rule of sight," or "seeing distance," and is thought by some not to be satisfactory as a practical test in all cases, because to carry it to its legal consequences would require the vessels to cease to move. Hughes on Admiralty, 263.

But, whatever the true interpretation of the rule may be, the West Nomentum was violating it in running into an area in close proximity to the lightship at 8 or 10 knots an hour in a dense fog, when her officers must have known that vessels entering and departing from the Columbia river in a fog were liable to and usually did call there, in order to get their bearings and wait for an opportunity to proceed on their way. Her speed was such that, although her engines were stopped at the time of the collision, her momentum carried her out of sight of the schooner, and the hearing of those aboard her, before her lifeboat could be lowered, and it was unable to find them, although an effort was made to do so.

It is difficult, if not impossible, to determine from the evidence whether the West Nomentum had a lookout on watch at the time of the collision, or whether he had left his post to call the next watch; but in any event the vessel was at fault in proceeding at an unreasonable rate of speed and is liable for damages caused thereby.

[2] As far as I am able to ascertain from the testimony, the schooner was not at fault. She was in a place where she had a right to be, and was simply hovering about the lightship, waiting for the fog to raise, so she might proceed on her voyage.

[3] The remaining question is the amount of damages. The schooner, her cargo, and fishing tackle were a complete loss. The evidence shows that the reasonable value of the cargo and the fishing tackle was $1,500 each, and

I so find. The schooner was purchased by her owner in 1916 for $3,000, was later rebuilt and overhauled at an expense of $4,500, and was listed for taxation purposes at $1,450. She was apparently in good condition at the time of her loss, and the witnesses place her value at from $10,000 to $12,000; but in my judgment $7,500 was a fair and reasonable value.

[4, 5] The amount of recovery on the account of the death of Einar Olson and Eldor Neilsen, the two persons who lost their lives as a result of the collision, is to be determined. The Death on the High Seas Act (41 Stat. 537 [Comp. St. §§ 1251½–1251½g]) provides that, when death of a person shall be caused by the wrongful act or neglect or default occurring on the high seas, the personal representative of the decedent may maintain a suit in the District Court of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parents, child or dependent relatives, against the vessel, person, or corporation which would have been liable had death not ensued, and that in such action the recovery shall be a fair and just compensation for all of the loss sustained by the persons for whose benefit the suit is brought, and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought.

Einar Olson was about 31 years of age, and left surviving him a wife 26 years old and a daughter 5 years old. He was an industrious young man of good habits, and had an earning capacity of from $2,000 to $3,000 a year. Eldor Neilsen was 49 years old and left surviving him four children, varying in age from 7 to 16 years. He was likewise industrious and of good habits, and with an earning capacity of from $2,000 to $3,000 a year.

It is always difficult for a court to determine the pecuniary loss to a widow and minor child by the death of the husband and father. There is no fixed rule by which it can be guided; but, after due consideration of the evidence, I am of the opinion that the fair and reasonable loss in this case is $15,000 to the widow and minor child of Einar Olson, to be apportioned two-thirds to the wife and one-third to the child, and $12,000 for the minor children of Eldor Neilsen, in equal shares.