## THE KAGA MARU.

(District Court, W. D. Washington, N. D. March Term, 1927.)

No. 7071.

**1. Evidence ⊝243(5)—Statement of master as to speed of ship at time of collision held admissible, though not pleaded; but this does not apply to pilot.**

Statement by master of ship as to conduct of ship is admissible, though not pleaded, but this does not apply to statement by pilot; hence statement of master subsequent to collision, to disinterested party, as to speed of ship at time of collision, was admissible.

**2. Evidence ⊝383(7)—Log prepared after vessel reached port after collision held not to outweigh testimony of disinterested eye-witnesses.**

Log of vessel, which was not prepared until after vessel arrived in port after collision, and after some conversation and understanding between navigating officers, was not an independent record of the events, made by the officer charged with that duty at the time as they occurred, and did not outweigh testimony of eyewitnesses and disinterested parties.

**3. Collision ⊝95(7)—Both steamship and towing tugs held at fault in collision of steamship with tow in fog (Inland Navigation Rules, art. 16 [Comp. St. § 7889]).**

Evidence *held* to show that towing tugs and steamer colliding with tow were at fault in moving at excessive rate of speed in fog, in violation of Inland Navigation Rules, art. 16 (Comp. St. § 7889), and that failure of one of tugs to keep proper lookout contributed to collision.

**4. Collision ⊝100(2)—Vessels, after hearing whistles, had no right to proceed in fog on assumption as to location of other vessels, until they were definitely located (Inland Navigation Rules, arts. 16, 27 [Comp. St. §§ 7889, 7901]).**

Under Inland Navigation Rules, arts. 16, 27 (Comp. St. §§ 7889, 7901), navigating officer of steamship, after hearing whistles of tugs, had no right to proceed in fog on assumption that tugs and tow were "well off to starboard," until such vessels were definitely located, nor should such vessels have proceeded at the speed at which they were traveling after hearing whistles of steamship for 10 minutes.

**5. Collision ⊝100(2)—Vessel must maintain only such speed in fog as will enable her to stop before she collides with another (Inland Navigation Rules, art. 16 [Comp. St. § 7889]).**

Under Inland Navigation Rules, art. 16 (Comp. St. § 7889) vessel is bound to maintain only such speed in fog as will enable her to stop by reversing her engines at full speed before she collides with vessel which she should see through fog.

**6. Collision ⊝107—Stubborn adherence to rule plainly inviting collision with improperly navigated vessel may be culpable fault (Inland Navigation Rules, art. 27 [Comp. St. § 7901]).**

In view of Inland Navigation Rules, art. 27 (Comp. St. § 7901) even improper navigation of another vessel does not excuse adherence to a definite rule, when such adherence plainly invites collision, and stubborn adherence to rule is sometimes culpable fault.

**7. Collision ⊝77—Failure to keep proper lookout, especially where other craft are known to be in vicinity, is culpable negligence.**

Strict performance of vessel's duty to maintain proper lookout is required, and failure to do so, especially when other craft are known to be in vicinity, is culpable negligence.

**8. Collision ⊝77—Lookout should be placed as low and as far forward as possible, and devote his attention to this duty.**

Lookout should be placed as low and as far forward on vessel as possible, and must devote his attention to this duty, and officer of the deck or helmsman cannot serve as lookout.

**9. Collision ⊝77—Preferred vessel is not relieved of obligation to maintain proper lookout to avoid collision.**

Vessel is not relieved of obligation to maintain proper lookout because it is the preferred vessel, if prudent navigation with the aid of a good lookout would have avoided collision.

In Admiralty. Libel by Libby, McNeill & Libby, a corporation, against the steamship Kaga Maru, her engines, boilers, furniture, and equipment, and persons claiming interest therein, claimed by the Nippon Yusen Kaisha, a corporation. Damages ordered to be divided.

Kerr, McCord & Ivey, of Seattle, Wash., for libelant.

Oliver C. McGilvra, of Seattle, Wash., for respondent and claimant.

NETERER, District Judge. On September 18, 1922, at 10:42 a. m., at a point off West Point in the fairway of vessels coming into and going from the port of Seattle from and in a northerly direction, while heavy fog prevailed and visibility was limited to about 400 feet, a collision occurred between the George Curtis, a sailing vessel of 1,837 gross tons, length 240.7 feet, beam 42.2 feet, depth 25.2 feet, in tow by the steam tug San Juan, of 284 gross tons, length 118 feet, beam 24.5 feet, depth 13.5 feet, and the gas boat Lillico No. 20, of 32 tons gross, length 60.3 feet, beam 18.2 feet, depth 5.45 feet, the flotilla in charge of Capt. Schade, stationed on board the Cur-

tis, and the Kaga Maru, a twin screw steam steel vessel, 5,860 gross tons, length on tonnage deck 445 feet, beam 49.17 feet, depth 33.52 feet, in charge of Capt. Sprague, stationed on the bridge. The Lillico ahead, with a 60-foot tow line on the bow of the Curtis, and the San Juan, made fast to the port after quarter of the Curtis, left the Ames Terminal in the Seattle harbor at 9:08 a. m. for winter quarters in Lake Union via the Government Canal. Visibility was from one-half mile to a mile. The fleet proceeded at a speed of about 5 knots an hour until 10:10 a. m., when, for the purpose of facilitating entry into the canal locks, the San Juan was changed from the port to the starboard after quarter of the Curtis, requiring from 5 to 10 minutes. While the San Juan was changing position the Lillico was proceeding at 2½ knots per hour. After the change the fleet proceeded on a course for West Point Light, N. N. E., and maintained the general course, and presumably the former speed, until 10:37, when the engines of the San Juan were stopped, and the Lillico proceeded under "slow bell" until 10:40, when the Kaga Maru approached rapidly and the engines of the San Juan were reversed, and the Lillico swung off to port to prevent the bow of the Curtis to swing to starboard by the reverse engines of the San Juan. The fog was dense. Regulation fog signals were blown by the San Juan and the Lillico and the Kaga Maru.

The Kaga Maru, with freight and passengers, left Victoria, B. C., at 4 a. m. for Seattle. Off Port Townsend fog was encountered, speed reduced, and fog signals blown. The fleet was proceeding approximately north and the Kaga Maru was moving in a southeasterly direction.

Both vessels were damaged. The lookout on the Lillico was in front of the pilot house, which is 12 feet from the stem. Schade and McGregor were looking out from the forecastle of the Curtis. A lookout was stationed forward on the Kaga Maru. The whistle of the Kaga Maru was heard by the fleet about 10 minutes prior to the collision.

The testimony is overwhelming—substantially all of the members of the crew testified, and their testimony is consistent and in harmony—that the whistles of the San Juan and the Lillico were given before the whistle of the Kaga Maru was heard by the fleet. The testimony is conclusive that the San Juan had an 8-inch steam whistle and 1½ inches of steam pipe connection, and that it did carry from 2 to 3 miles; that the Lillico's "shrill and penetrating air whistle" did carry from 1½ to 2 miles; that the whistles of both tugs were constantly blown, one long and two short blasts, alternating, producing a whistle at least each half minute from the fleet. It is incredible from the evidence that the whistles from the fleet were not heard by the lookout or officers on the Kaga Maru, as soon as the Kaga Maru whistle was heard by the fleet, or soon thereafter. It is difficult to conceive a situation where, as contended, the Kaga Maru, for some minutes prior to the collision, was proceeding at only steering speed and did not hear the whistles of the fleet, at least 6 or 8 minutes prior to the collision. If the Kaga Maru was moving at a greater speed, the whistles would not be heard so soon, because of the greater distance away and noise. Either the whistles were heard 6 or 8 minutes prior to collision, or the Kaga Maru was moving at a high speed.. If moving at 7 or 8 knots, it is conceivable that the whistles were not distinguished until several minutes before the collision.

[1] The charge is that the Kaga Maru was moving at an excessive speed. There is testimony as to a statement of the master, subsequent to the collision, that she was moving 7 or 8 knots an hour. This statement was made to disinterested parties. While there is objection to the statement of the master as to the speed as not part of the res gestæ and because the court sustained the exception to a similar statement in the libel made by the pilot, I think the objection and the motion to strike should be overruled. A statement by the master with relation to the conduct of the ship is admissible, and it is not necessary to plead it, while this does not apply to a statement by the pilot. See The Potomac, 8 Wall. 590, 19 L. Ed. 511; The Lisbonese (C. C. A.) 53 F. 293; The Wilhelm (C. C. A.) 59 F. 169; The Severn (D. C.) 113 F. 578. No collision could have occurred if the testimony of both sides is true, nor if the Kaga Maru was going at the speed contended for.

[2] The collision occurred in the fairway. It is a place much frequented by watercraft at all times, and requires exercise of caution in the operation of vessels. I do not think, from the evidence, that the log of the Kaga Maru can enlighten the situation very much. The log was not prepared until after the vessel arrived in port, and after some conversation and understanding between some of the navigating officers. It is therefore not an independent record of the events transpiring, made by the officer charged with that duty, at the time, as they occurred, and does not outweigh the testimony of eyewitnesses and disinterested parties.

The San Juan was the controlling power of the Curtis. When the Kaga Maru became visible and the San Juan engines reversed, the Lillico swung off to port in an attempt to swing the bow of the Curtis to port to overcome the reverse motion of the San Juan, tending to swing the bow of the Curtis to starboard, and the libelant contends that the hard aport helm swung the Kaga across and into the bow of the Curtis. The commissioner found "that as a matter of mechanics the rudder of the vessel is the pivot on which she swings." In this the commissioner erred. Knight, on Modern Seamanship (7th Ed.) at p. 330, says:

"As regards the track of the ship in turning under these conditions, we have seen that the curve of a twin screw ship, with both screws going ahead and helm hard over, does not differ materially from that of a single screw ship; but it would be natural to suppose that the case must be greatly changed when the inner screw is reversed to help the helm. There is, in fact, a considerable difference, but it is far less than is commonly supposed; at least in the first brief interval after the turn begins—in the interval, that is to say, during which the emergency for which the action is taken must work itself out. The complete turning circles will be widely different, but the track of the vessel for some time will be but little modified. The stern will, as in all other cases, go off to leeward, and the ship will gain nothing to the side toward which her head is thrown, until she has covered from 2 to 3 lengths along her old track. She will, however, gradually lose her speed, and will throw her head around rather more sharply, with the result that, by the time she does begin to move away from her old line of advance, she will do so at a considerably greater angle than if her helm were merely put over without reversing the inner screw."

On page 305 of the same book it is said:

"It will be noted that, the helm being put hard over as rapidly as possible (position A), the ship begins to turn at once, and turns with increasing rapidity up to about the point B, from which point onward she turns uniformly in a path which is practically a circle. As she swings around the circle, her bow points steadily inward while her stern sweeps out a circle considerably larger than that traced by her bow. She does not—that is to say—follow her own keel line, but presents her bow and side to the water through which she moves. To this statement, however, some qualification must be made, since there is one point of the ship which does, at every part of the circle, follow the line along which the keel is pointing at that part. This is called the 'pivoting point.' It is the point about which the ship turns, as viewed by an observer on board. Its position depends upon the speed and the maneuvering power of the ship. When these are exceptionally high, it is well up toward the stem, and it may even be outside and ahead of the ship, on the keel line prolonged."

And then on page 307 says:

"In our average ship, we may take it about one-quarter the length of the ship from the stem."

The findings of fact of the commissioner must be set aside and modified as herein indicated.

[3] After a reading of the testimony, the conclusion to me is inescapable that the Kaga Maru was moving at an excessive rate of speed. I also think the fleet was moving at a greater speed than the circumstances warranted. The oral testimony is overwhelming as to the speed of the Kaga Maru. The physical facts, from all of the surroundings, I think, are confirmatory. This is likewise affirmed by the master of the Kaga Maru shortly after the collision, that the vessel was moving 7 or 8 knots per hour. The white wash seen by the master and pilot of the Kaga Maru abreast the bridge is shown to have been created as likely, if not more likely, by the Lillico in its forward movement and by the San Juan in its reverse motion. Without detailing the testimony of the several witnesses, some entirely disinterested, together with the testimony of the witnesses called on behalf of the respondent, I entertain no doubt as to the fact that the speed of the Kaga Maru was not less than five miles an hour, and I believe much more. The visibility was approximately 400 feet. I am likewise convinced that the whistles of the fleet were heard, or should have been heard by the Kaga Maru going at five miles an hour. The collision is unexplainable upon any other theory than excessive speed.

Another strong physical fact is the time in which the Kaga Maru came from Victoria to the point of collision, and also the lapse of time between the sighting of the Kaga Maru by the fleet, and the time she was out of sight. The testimony is practically uncontroverted that it was probably less than a minute and a half after she came in sight until she was out of sight. Several witnesses testified to the time that elapsed from the sighting of the bow of the Kaga Maru and losing sight of her stern after the collision. Considering the length of the vessel, the visibility in approaching and departing, and the time elapsing from the appearance and her disappear-

ance, is strongly indicative of a speed of from 6 to 8 knots an hour.

Sprague, pilot of the Kaga Maru, in rebuttal, said, when he first sighted the fleet, it appeared to be "way off on our starboard bow." In his direct testimony the master of the Kaga Maru said the Kaga Maru was proceeding at 3 or 3½ knots, and stated that the maneuvers on the part of the master of the San Juan, in reversing his engine, was good seamanship. This he afterwards explained. He said that the Kaga Maru under a 6-knot speed could stop under full reverse in 3 lengths, and under 3½ knots, could stop within 400 feet.

The Lillico was sighted when 400 feet away. If the Kaga Maru was moving at 1 or 1½ knots, as claimed, then it could have stopped in less than 400 feet, and 3 or 3½ knots in 400 feet, and collision could have been avoided, as the San Juan, of the fleet, at the time was under reverse engines, and the Lillico was swinging off to port, and forward motion was checked by dead and reverse engines of the San Juan.

The fleet proceeded at 5 knots per hour until 10:10; then 2½ knots for 5 or 10 minutes, while the San Juan was changed from port quarter to starboard quarter, when presumably—there is no testimony to the contrary—the former speed was resumed until 10:37; then proceeded under "slow bell," San Juan engines stopped, until 10:40, when the San Juan engines were reversed and Lillico swung off aport.

[4] Page 7, article 16, Inland Navigation Rules (Comp. St. § 7889), provides that every vessel in a fog shall go at a moderate speed, having careful regard to the existing circumstances and conditions, and this is said by the courts to be such speed as to enable the vessel to stop within the distance from which she can see another vessel. The Bailey Gatzert (D. C.) 170 F. 101, affirmed (C. C. A.) 179 F. 44; The Belgian King (C. C. A.) 125 F. 869; The William H. Taylor (C. C. A.) 278 F. 717; The Nacoochee (C. C. A.) 127 F. 330. And the navigating officer of the Kaga Maru had no right to proceed upon the assumption that the fleet was "well off to starboard" until the fleet was definitely located. Nor should the fleet have proceeded at the speed established, after hearing the whistles of the Kaga Maru for ten minutes. See Inland Rules, article 27; The Tremont (D. C.) 160 F. 1016, affirmed (C. C. A.) 161 F. 1. A navigator has no right to any assumption in a dense fog, and erroneously proceed. The Supreme Court in The Genesee Chief, 53 U. S. (12 How.) 443, 13 L. Ed. 1058, said:

"If this mistake continued until the collision was about to take place, it would be the strongest proof of negligence, as there was abundance of time to discover their error."

[5] Whatever the speed, the vessel is bound to maintain only such speed as will enable her to stop by reversing her engines at full speed before she collides with a vessel which she should see through fog. See The Fullerton (C. C. A.) 211 F. 833. See, also, as to speed, The Winooski (D. C.) 162 F. 64; The Glenogle (D. C.) 122 F. 503; The Catalonia (D. C.) 43 F. 396.

[6] The Kaga Maru, it is contended, could have avoided the collision by a hard over helm; but its pilot says that the Kaga Maru could not, and did not, deviate from its course, because violative of the rules of navigation. Even improper navigation of another vessel does not excuse adherence to definite rule, when it would plainly invite collision. Stubborn adherence to rule is sometimes a culpable fault. See The New York, 175 U. S. 187, 205, 20 S. Ct. 67, 44 L. Ed. 126; see, also, article 27, Inland Rules (Comp. St. § 7901), and West Hartland (D. C.) 295 F. 550.

[7] Was a proper lookout maintained upon the Lillico? A lookout is elementary in navigation and good seamanship, and strict performance of this duty is required, and a failure, especially when other craft are known to be in the vicinity, is culpable negligence, and the Supreme Court in The Ariadne, 80 U. S. (13 Wall.) 475, 478 (20 L. Ed. 542), said, "approaches very nearly the line of reckless navigation." The duty is that of the highest importance, and the court then says that it is the duty of *all courts* having jurisdiction to give it the fullest effect. "Every doubt as to the performance of the duty, and the effect of nonperformance, should be resolved against the vessel [offending] until she vindicates herself by testimony conclusive to the contrary." This statement is not modified in The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943, and was emphasized by Judge Morrow, speaking for the Circuit Court of Appeals in this circuit in Wilder's S. S. Co. et al. v. Low et al., 112 F. 161, 172. There is no obligation which the courts are more disposed to enforce. See Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey (C. C. A.) 238 F. 560. See, also, The J. W. Wonson (C. C. A.) 239 F. 857.

[8] The lookout should be stationed forward in the "eyes" of the vessel, says the Supreme Court in The Ottawa, 70 U. S. (3 Wall.) 273 (18 L. Ed. 165), " * * * on the forward part of the vessel, nearer the stem. Persons stationed on the forward deck are nearer the

water line, * * * and more readily ascertain their exact course." And in The Colorado, 91 U. S. 692, 699 (23 L. Ed. 379) the court says: "Lookouts are valueless unless they are properly stationed, and vigilantly employed in the performance of their duty; and if they are not, and in consequence of their neglect the approaching vessel is not seen in season to prevent a collision, the fault is properly chargeable to the vessel, and will render her liable, unless the other vessel was guilty of violating the rules of navigation."

[9] The courts recognize the precaution of placing the lookout as low and as far forward as possible. Chamberlain v. Ward, 62 U. S. (21 How.) 548, 16 L. Ed. 211; The Ottawa, supra; Eastern Dredging Co. v. Winnisimmett Co. (C. C. A.) 162 F. 860. The lookout must devote his attention to this duty. The officer of the deck, or helmsman, cannot serve as lookout. The Pilot Boy (C. C. A.) 115 F. 873; The Fannie Hayden (D. C.) 137 F. 280; N. Y. & Oriental S. S. Co. v. N. Y., N. H. & H. R. Co. (D. C.) 143 F. 991. Nor is the vessel relieved of this obligation because it is the preferred vessel, if prudent navigation, with the aid of a good lookout, might have avoided the collision. The Devonian (D. C.) 110 F. 588.

The lookout standing immediately forward the pilot house, which is 12 feet from the stem, on the Lillico, may not have contributed to the collision; but where the fog is dense, and visibility limited to 400 feet, a few feet may mean much—the lookout should be as far forward as possible—and under the circumstances in this case the court cannot say that it was not a contributing cause, and, because of this and excessive speed, the Curtis must be held culpable with the Kaga Maru, and damages will be divided, neither party to recover costs.